# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEYOND THE DOG, LLC,<br>　　　*Plaintiff*,<br><br>　　　v.<br><br>ALLYSON SALZER and CANINE<br>BEHAVIORAL BLUEPRINTS, LLC,<br>　　　*Defendants.* | No. 3:24-cv-1439 (VAB) |
| ALLYSON SALZER and CANINE<br>BEHAVIORAL BLUEPRINTS, LLC,<br>　　　*Counterclaim-Plaintiffs*,<br><br>　　　v.<br><br>BEYOND THE DOG, LLC, KRISTYN<br>ECHTERLING-SAVAGE, and SEAN<br>SAVAGE,<br>　　　*Counterclaim-Defendants.* | |

## RULING AND ORDER ON MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Beyond the Dog, LLC ("Beyond the Dog") has sued Allyson Salzer and Canine

Behavioral Blue Prints, LLC ("CCB") for claims of breach of contract, misappropriation of trade

secrets, unjust enrichment, and unfair competition. *See* Amended Complaint, ECF No. 34 (Jan.

13, 2025) ("Am. Compl.")

Allyson Salzer and CBB (collectively the "Counterclaim-Plaintiffs" and the

"Defendants") have counter-sued Beyond the Dog, Kristyn Echterling-Savage ("Echterling-

Savage"), and Sean Savage ("Savage") (collectively the "Counterclaim-Defendants" and the

unfair competition all in violation of the Connecticut Unfair Trade Practices Act ("CUPTA"),

tortious interference with advantageous prospective contractual relationship that is injurious to

1

reputation, tortious interference with contractual relations, defamation *per se*, unfair competition, and negligent infliction of emotional distress. *See* Answer, ECF No. 86 (May 9, 2025) ("Amended Answer").

The Defendants have moved for a preliminary injunction and temporary restraining order against the Plaintiffs. Mot. for Temp. Restraining Order & Prelim. Inj., ECF No. 87 (May 9, 2025) ("Mot.").

For the reasons stated below, the Defendants' motion for a preliminary injunction is **GRANTED**, the motion for a temporary restraining order is **DENIED** as moot, and the Court orders the following:

1.  The Plaintiffs are restrained from deploying agents to falsely assert themselves as potential clients of Defendants to spy on Defendants to improperly investigate Defendants business and obtain Defendants' business documents, or any other covert corporate espionage activities.

2.  The Plaintiffs are restrained from communicating with Dr. Salzer's employers at the MSPCA and Our Companions or with any other of Dr. Salzer's employers or business relationships regarding Dr. Salzer or the claims of this litigation except for the purposes of discovery.

3.  The Plaintiffs are restrained from following, or engaging agents to follow, Dr. Salzer, park outside her house, places of employment, or at her clients' houses, or otherwise communicating or speaking with Dr. Salzer.

4. The Plaintiffs are restrained from telling any third party that Dr.
   Salzer breached her contract with Beyond the Dog or
   misappropriated trade secrets or confidential information.

5. The Plaintiffs are restrained from initiating or otherwise promoting
   further proceedings with the University of Kansas regarding the
   issues of this litigation, and are to provide the relevant officials at
   the University of Kansas a copy of this Ruling and Order.

## I.  BACKGROUND

### A.  Procedural Background

On September 9, 2024, Beyond the Dog filed its Complaint. Compl., ECF No. 1.

On December 1, 2024, the Defendants filed a motion to dismiss the Complaint. Mot. to Dismiss, ECF No. 25.

On January 13, 2025, Beyond the Dog filed its Amended Complaint. Am. Compl.

On the same day, Beyond the Dog filed its opposition to the Defendants' motion to dismiss. Mem. in Opp'n to Mot. to Dismiss, ECF No. 35.

On February 3, 2025, the Defendants filed their Answer to Beyond the Dog's Amended Complaint with counterclaims against the Plaintiffs. Answer, ECF No. 36.

On March 26, 2025, Beyond the Dog filed a motion to dismiss all of the Defendants' counterclaims. Mot. to Dismiss all of Counter Plaintiffs' Counterclaims, ECF No. 67.

On April 11, 2025, Echterling-Savage and Savage filed a motion to dismiss the Defendants' counterclaims for lack of jurisdiction. Mot. to Dismiss, ECF No. 76.

On May 9, 2025, the Defendants filed an Amended Answer to Beyond the Dog's Amended Complaint with counterclaims against the Plaintiffs. Amended Answer.

On the same day, the Defendants filed their motion for preliminary injunction and temporary restraining order. Mot.

On May 13, 2025, the Court denied as moot all pending motions to dismiss given the filing of superseding pleadings. Order, ECF No. 95.

On the same day, the Court set a motion hearing on the Defendants' motion for preliminary injunction and temporary restraining order for July 14, 2025. Notice, ECF No. 97.

On May 30, 2025, the Defendants filed a motion seeking to compel the Plaintiffs to produce additional discovery responses. Motion Regarding Discovery Issues and Memorandum of Law in Support of Defendants' Motion Regarding Discovery Issues, ECF No. 105.

On the same day, the parties filed a joint motion for temporary relief in anticipation of the motion hearing on the Defendants' motion for preliminary injunction and temporary restraining order. Mot. Submission Regarding Temporary Relief, ECF No. 107.

Also on the same day, the Plaintiffs filed a motion seeking to compel the Defendants to produce additional discovery responses. Plaintiff Beyond the Dog LLC's Position Regarding Discovery Dispute, ECF No. 110.

On June 12, 2025, the Court granted in part and denied in part the parties' joint motion for temporary relief in anticipation of the motion hearing on the Defendants' motion for preliminary injunction and temporary restraining order. Order, ECF No. 121 ("Order on Temp. Relief").

On the same day, the Court granted in part and denied in part the Defendants' motion to compel and denied the Plaintiffs' motion to compel. Order, ECF No. 122 ("Order on Mots. to Compel").

On June 30, 2025, the Plaintiffs filed an Answer to the Defendants' amended counterclaims. Answer, ECF No. 135.

On July 11, 2025, the Plaintiffs filed their opposition to the Defendants' motion for preliminary injunction and temporary restraining order. Pls.' and Counterclaim Defs.' Mem. in Opp'n to Defs. and Counterclaim Pls.' Mot. for a Temp. Restraining Order and Prelim. Inj., ECF No. 140 ("Opp'n").

On July 14, 2025, the Court held a hearing on the Defendants' motion for preliminary injunction and temporary restraining order. Min Entry, ECF No. 142. At the hearing, the parties presented testimony from the following witnesses: Dr. Terry Bright, Perry Winter, Ashley Nordike, Michelle Crosby, Dr. Allyson Salzer, Sean Savage, Dan McClutchy, and Dr. Kristen Echterling-Savage. The Court also admitted into evidence a number of exhibits.[1]

---

[1] DX1, Declaration of Terri Bright (provisional)
DX2, 6/5/25 Declaration of Terri Bright
DX3, Canine Behavioral Blueprints Evaluation for Gracie May
DX4, Beyond the Dog Questionnaire
DX5, E-mail from Dr. Kristyn Echterling-Savage
DX6, Noncompete and Nondisclosure Obligation of Allyson Salzer
PX17, Functional Assessment Worksheet and Questionnaire
DX7, Declaration of Peyton Winter
DX8, E-mail from Peyton Winter
DX9, 2/9/25 E-mail inquiry Re: Noncompete
DX10, Questionnaire Behavior Evaluation BTD
DX11, Appendix D Form (provisionally)
DX12, Screenshots Google Drive
DX13, Trainer Noncompete
DX14, A[l]lyson Salzer Ph.D. Dissertation
DX15, E-mail from University of Kansas
DX16, Animal Use Statement by University of Kansas
DX17, 6/24/25 E-mail from Salzer to McNally
DX18, Meeting with "K" Checklist
PX10, Letter, Noncompete, and Nondisclosure of Allyson Salzer
PX20, Letter Received 9/17/24
PX9, E-mail from 2/9/19 from Ms. Crosby to Brian X. Bush
PX1, Dissertation of Dr. Bright

On July 15, 2025, the Court ordered the parties to submit additional briefing on the Defendants' motion for preliminary injunction and temporary restraining order. Order, ECF No. 141.

On July 25, 2025, the Plaintiffs filed their supplemental brief in opposition to the Defendants' motion for preliminary injunction and temporary restraining order. Supplemental Mem. in Opp'n, ECF No. 148 ("Supp. Opp'n").

On that same day the Defendants filed their supplemental brief in support of their motion for preliminary injunction and temporary restraining order. Mem. in Support., ECF No. 150 ("Supp. Mem.")

On August 1, 2025, the Plaintiffs filed their reply to the Defendants' supplemental brief in support of their motion for preliminary injunction and temporary restraining order. Reply, ECF No. 154 ("Reply to Supp. Mem.")

On that same day, the Defendants filed their reply to the Plaintiffs' supplemental brief in opposition to the Defendants' motion for preliminary injunction and temporary restraining order. Reply, ECF No. 155 ("Reply to Supp. Opp'n").

## B. Factual Findings

On July 14, 2025, the Court conducted a hearing on the Defendants' motion for a temporary restraining order and preliminary injunction. As a result of the parties' written submissions and oral arguments, the Court finds the following.[2]

---

DX19, Video of Assessment Tools
DX20, Poster by Beyond the Dog
PX8, Google Docs Business Record Beyond the Dog

Hearing Tr., ECF No. 146 at 3 (July 20, 2025).
[2] *See* Fed. R. Civ. Pro. 52(a)(2) ("In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action.").

a. *Background and Training of Dr. Salzer*

Dr. Salzer obtained her Bachelor of Science degree in behavior analysis from the University of Wisconsin, Eau Claire, and her Master's and Ph.d in behavioral psychology from the University of Kansas. Transcript of July 14, 2025, hearing on preliminary injunction and temporary restraining order, ECF No. 146 at 133:23–134:7 (July 20, 2025) ("Hearing Tr.").

While an undergraduate student, Dr. Salzer conducted indirect assessments with dogs. *Id.* at 134:8–20. This constituted a main component of her Ph.D studies as well. *Id.* at 135:6–11.

b. *The Beginning of Dr. Salzer's Relationship with the Savages and Beyond the Dog*

While studying for her Ph.D at the University of Kansas, Dr. Salzer's academic adviser, Dr. Derek Reed and his wife and department chair, Dr. Florence DiGennaro-Reed, introduced Dr. Salzer to Dr. Echterling-Savage and Sean Savage. *Id.* at 134:21–23, 135:25-136:9.

To work with Beyond the Dog, Dr. Salzer had to enter into a Trainer Non-Compete Agreement ("the Agreement"), which before she signed Dr. Salzer had Dr. Derek Reed and the University of Kansas's Office of the General Counsel review it. *Id.* at 136:22–137:20. Dr. Salzer wanted to ensure that her academic studies, any work for the University of Kansas, and her interest in work with nonprofit shelters, was protected. *Id.* at 137:15–20.

The Agreement's relevant terms include: a two-year post-termination obligation that prohibited Dr. Salzer from: (a) soliciting customers within specific prohibited territories (limited to the Johnson, Platte, Jackson, Clay, Douglas counties of Missouri and Kansas and the greater Houston, Texas areas); and (b) disclosing Beyond the Dog's confidential and proprietary information. *See* DX13, Trainer Noncompete. Those post-termination obligations expired on March 22, 2025, two years after Dr. Salzer left Beyond the Dog. *Id.*; ECF No. 34 -2 at 2 (Jan. 13,

2025) ("I am writing to formally notify you both of my resignation from Beyond the Dog, LLC in the role of Training Mentor; my last day will be March 22nd, 2023.").

The University of Kansas added the following language: "Activities solely for academic purposes and not-for-profit will be made exempt from the agreement. This includes research conducted on basic behavioral processes and being involved in teaching practices at the University of Kansas while the trainer is enrolled. Both parties acknowledge research conducted as a student at the University of Kansas is owned by the university and the trainer does not have the right to give away the research." *Id.* at 138:1–10.

As part of her Ph.D dissertation, Dr. Salzer explored more efficient ways to address and treat unwanted behaviors in dogs. *Id.* at 139:16–140:3. Dr. Salzer was given permission from Dr. Echterling-Savage to use Beyond the Dog information in her dissertation, including the front and back end of behavior evaluation questionnaires used at Beyond the Dog. *Id.* at 141:17–20 ("Q. Did you receive permission from the Savages to use the Beyond the Dog information in your dissertation? A. I received permission specifically from Dr. Kristyn Echterling-Savage.") (Testimony of Dr. Salzer); *id.* at 142:19–143:5 ("Q. And what is Appendix D? A. Appendix D is the back end and complete version of the dissertation copy of the behavior evaluation questionnaire that I used for my dissertation. Q. And you had permission to use these questionnaires in your dissertation? A. Yes. Q. From who? A. I went through KU's general counsel as well, as their IUCUC office, which is the ethics board for animal behavior in conjunction with Dr. Derek Reed, Dr. Florence DiGennaro-Reed, and Dr. Kristyn Echterling-Savage.") (Testimony of Dr. Salzer); *id.* at 146:13–20 ("Q. Which questionnaire were you to be using in your research? A. The dissertation copy that was outlined in Appendix D. Q. The front end and the back end? A. I was given permission to use both. Q . . . .You were authorized by Dr.

Kristyn Savage to use the front end and back end of the Beyond the Dog questionnaire; is that correct? A. Yes.") (Testimony of Dr. Salzer); *id.* at 256:2–16 ("THE COURT: It is a yes or no. He asked you a question. Did you give her permission to use the questionnaire for part of her dissertation? THE WITNESS: The front end. THE COURT: The front end. Did you give per permission to use part of the content? THE WITNESS: Yes.") (Testimony of Dr. Echterling-Savage)

After she defended it in August of 2022, Dr. Salzer's doctoral dissertation became publicly available at the University of Kansas library. *Id.* at 140:22–141:4.

> c. *End of Dr. Salzer's Employment with Beyond the Dog, Allegations of Misconduct by Dr. Salzer, and the Savages' Subsequent Harassing Actions*

In March 2023, Dr. Salzer left Beyond the Dog. *Id.* at 228:9–22. Following her departure, Dr. Salzer moved to Connecticut and formed an LLC called Canine Behavioral Blueprints that operated under a behavioral consultation model. *Id.* at 135:19–23. After moving to Connecticut, Dr. Salzer started working and conducting animal assessments for the Massachusetts Society for the Prevention of Cruelty to Animals ("MSPCA"). *Id.* at 12:16, 14:8–16, 23:24.

Sean Savage had heard secondhand reports that Dr. Salzer had criticized him and his wife to other Beyond the Dog employees to encourage them to leave Beyond the Dog. *Id.* at 228:23–229:17. Sean Savage felt betrayed by Dr. Salzer. *Id.* at 230:3–15.

During her time at MSPCA, Dr. Salzer was approached by Dan McClutchy. *Id.* at 29:16–20. Mr. McClutchy is a longtime friend of Sean Savage. *Id.* at 157:18–24. During one phone call between Sean Savage and Mr. McClutchy, Sean Savage suggested that Dr. Salzer might have been acting unethically and using the Savages training techniques. *Id.* at 158:8–15, 216:24–218:15. Mr. McClutchy offered to help by undertaking an undercover, "mystery shopper,"

investigation of Dr. Salzer's business Canine Behavioral Blueprints and to share any information with Sean Savage. *Id.* at 158:16–162:10.

On June 11, 2024, Mr. McClutchy started this undercover operation. *Id.* at 162:16–19. He contacted Dr. Salzer, inquired her help with a fake dog, and received an intake form from Dr. Salzer and filled it out. *Id.* at 162:20–165:10, 165:20–24. Mr. McClutchy then shared this intake form with Sean Savage. *Id.* at 165:11–166:10. Sean Savage thought the intake form looked like Beyond the Dog's intake form. *Id.* at 218:16–220:3. Because of Mr. McClutchy's interactions with Dr. Salzer, the MSCPA put in place a restraining order due to Dr. Salzer's fear of fake clients and of being watched. *Id.* at 32:9–33:25.

Also, during Dr. Salzer's time at MSPCA, Beyond the Dog sent a letter to MSPCA informing them of Dr. Salzer's noncompete and confidentiality obligations, telling them that it was important to ensure that Dr. Salzer did not infringe on Beyond the Dog's rights, and that they should take whatever acts necessary to ensure that Dr. Salzer does not benefit from misappropriation of Beyond the Dog's confidential information. *Id.* at 223:20–225:6.

Sean Savage authorized his attorney to send the letter to MSPCA partially because Dr. Salzer had allegedly ignored letters from Sean Savage. *Id.* at 220:12–25. Sean Savage would not hesitate to send the same letters to Dr. Salzer's future employers as he sent to MSPCA. *Id.* at 225:8–226:25.

Even though Dr. Salzer assured MSPCA that she was no in violation of her agreement with Beyond the Dog, this unexpected letter still left a negative impression with Dr. Salzer's employment there. *Id.* at 38:19–44:5; *see id.* at 43:25–44:5 ("I had to have conversations with [HR] about [the letter from the Savages about the potential of trade secrets being used by Dr. Salzer], and so it kind of leaves a black cloud over her application. Here I had told them I have

this amazing new employee who is followed by a legal letter saying please help avoid any issues down the road. That is kind of a landmine, you know, planted in her HR file forever.") (Testimony of Dr. Terri Blight).

In the summer of 2024, Dr. Salzer started working for Our Companions, a Connecticut-based animal rescue and sanctuary. *Id.* at 69:18–71:10. She had planned to give a lecture series throughout the country for Our Companions, *id.* at 71:11–72:6, a community outreach opportunity for Our Companions and a networking and business opportunity for Dr. Salzer and Canine Behavioral Blueprints. *Id.* at 72:7–73:12.

On September 10, 2024, Dr. Salzer presented the first and only lecture in the lecture series. *Id.* at 74:8–24. Before the lecture took place, Sean Savage contacted Peyton Winter, Dr. Salzer's supervisor at Our Companions, about attending the lecture. *Id.* at 76:1–8. Sean Savage did attend the lecture. *Id.* at 227:8–20. But he did not see or hear anything that he thought was Beyond the Dog's proprietary information during Dr. Salzer's MSPCA lecture. *Id.* at 227:13–228:4.

After the first lecture, Beyond the Dog had letter a sent to Our Companions from BTD informing Our Companions about Dr. Salzer's noncompete and confidentiality obligations. *Id.* at 77:20–25. After Ms. Winter received this letter, she reviewed the attendees to the first lecture, saw that Sean Savage had attended, and decided to cancel the lecture series. *Id.* Our Companions decided not to post a recording of the lecture as well. *Id.* at 78:1–15. After the letter, Dr. Salzer took an indefinite leave of absence from Our Companions, which caused them to cancel or adjust their programming. *Id.* at 78:16–79:20.

During the course of this litigation, the Savages also caused the University of Kansas to take down Dr. Salzer's dissertation from their publicly accessible library database. *Id.* at 213:18–215:4.

Sean Savage, however, admitted not having any certainty that Dr. Salzer had used Beyond the Dog's trade secrets, other than thinking that Dr. Salzer had used an intake form similar to Beyond the Dog's. *Id.* at 219:16–21 ("Q. Okay. Between receiving information from Mr. McClutchy and the filing of this lawsuit, you were never able to obtain certainty about whether Dr. Salzer was using any of BTD's proprietary information other than you say the intake form, right? A. That is all we had.") (Testimony of Sean Savage).

### d. Trade Secret Testimony

When asked at the July 14, 2025, hearing about Beyond the Dog's trade secrets, neither Sean Savage nor Dr. Echterling-Savage could identify the number or breadth of BTD's trade secrets. *Id.* at 207:14–20 ("Q. According to you, Beyond the Dog has at least 100 trade secrets, right? A. I don't know exactly how many trade secrets we have. We have quite a few. Q. I understand you don't know exactly how many, but you know it is at least 100, according to you, right? A. I don't know that.") (Testimony of Sean Savage); *id.* at 241:19–242:11 ("Q. So, to your understanding though, at minimum, there are dozens and dozens of Beyond the Dog trade secrets, right? A. Yes.") (Testimony of Dr. Echterling-Savage). Sean Savage also testified being unsure about the value of BTD's trade secrets. *Id.* at 210:2–9 ("Q. (Mr. Denning) And did I get an answer? I'm sorry, have you done any analysis of the value of BTD's trade secrets? A. No. Q. Has anyone else done an analysis of the value of BTD's trade secrets? A. I don't know. Q. Not to your knowledge, right? A. I don't know.") (Testimony of Sean Savage).

The front end of BTD's behavioral evaluation is not a trade secret. *Id.* at 246:24–247:4 ("Q. (Mr. Denning) I want to ask about some specific things, to see if we can save some time. Can we agree, Dr. Savage, that the front end, what your counsel calls the front end of the questionnaire, the questions, and the answers, are not a trade secret. Can we agree on that? A. Yes.") (Testimony of Dr. Echterling-Savage).

And the behavioral evaluation algorithm, which turns the questionnaire into the results, and which the Savages referred to as a critical part of "the back end" was discussed publicly by Dr. Echterling-Savage on a YouTube video. *Id.* at 260:22–266:1 ("Q. And the video you said that the scoring methodology assigned a dog a, quote, numerical value based on several factors including how they were acquired, size, breed, history of biting, and history of shock or drug therapy. Do you recall hearing yourself say that? A. Yes. . . . Q. When you said that the system gives a numerical value based on several factors, including how they were acquired, size, breed, history of biting and history of shock or drug therapy, you were talking about the algorithm, the thing in the middle between the client answers and the results, right? A. Yes. . . . Q. You know where we got that video? A. I believe it said YouTube. MR. DENNING: That's correct.") (Testimony of Dr. Echterling-Savage).

Ultimately, outside of the bold claims of the Savages—which the Court does not find credible—there is very little in this record to justify any allegation of Dr. Salzer's unauthorized use of the trade secrets of Beyond the Dog. To the extent any trade secrets of Beyond the Dog existed—and the record is rather thin on the specifics of any alleged trade secrets—and Dr. Salzer used them for her doctoral dissertation, any such use was proper, given the underlying agreement entered into by Dr. Salzer and Beyond the Dog and approved by Dr. Echterling-Savage herself. *Id.* at 142:19–143:5 ("Q. And what is Appendix D? A. Appendix D is the back

end and complete version of the dissertation copy of the behavior evaluation questionnaire that I used for my dissertation. Q. And you had permission to use these questionnaires in your dissertation? A. Yes. Q. From who? A. I went through KU's general counsel as well, as their IUCUC office, which is the ethics board for animal behavior in conjunction with Dr. Derek Reed, Dr. Florence DiGennaro-Reed, and Dr. Kristyn Echterling-Savage.") (Testimony of Dr. Salzer); *id.* at 146:13–20 ("Q. Let me -- this is important. So let me get it all out. You were authorized by Dr. Kristyn Savage to use the front end and back end of the Beyond the Dog questionnaire; is that correct? A. Yes.") (Testimony of Dr. Salzer).

Dr. Echterling-Savage's testimony to the contrary—at least, on this record—lacks credibility. *Id.* at 256:2–16 (THE COURT: It is a yes or no. He asked you a question. Did you give her permission to use the questionnaire for part of her dissertation? THE WITNESS: The front end. THE COURT: The front end. Did you give per permission to use part of the content? THE WITNESS: Yes.") (Testimony of Dr. Echterling-Savage); *id.* at 257:7–260:13 (Q. When you signed this, you believed that the information contained in here was accurate, right? A. Yes. . . . Q. Okay. The next sentence says, "To accomplish this, we will compare the results of the questionnaire with gold standard lengthier and potentially riskier assessment methods known as functional analysis." Do you see that? A. I do. Q. And the results of the Beyond the Dog questionnaire is the stuff on the other side of the algorithm, right, right? A. Yes. . . .) (Testimony of Dr. Echterling-Savage).

     *e.*   *Harm to Dr. Salzer from the Savages' Actions*

As a result of the actions by the Savages both before and during this litigation, Dr. Salzer has suffered harm. The Savages' letter to MSPCA raised concerns that Dr. Salzer might get fired. *Id.* at 152:10–18. Dan McClutchy's undercover operation led Dr. Salzer to be unable to trust

whether people calling on her were true clients, and made her nervous that her board-certified

behavior analyst credentials could be called into question by working on a dog without informed

consent. *Id.* 152:22–153:9. The Savages' contact with Our Companions damaged Dr. Salzer's

professional career, and her business through the loss of reputation and word of mouth. *Id.* at

81:14–82:20, 153:10–18. Although there is an insufficient basis on this record to connect it

directly to the actions of the Savages and Beyond the Dog, Dr. Salzer has now been diagnosed

with post-traumatic stress disorder, *id.* at 154:2–3, and also has now separated from her husband.

*Id.*

## II.    STANDARD OF REVIEW

"[T]he same legal standard governs motions for temporary restraining orders and motions

for preliminary injunctions." *Lazor v. Univ. of Connecticut*, 560 F. Supp. 3d 674, 677 (D. Conn.

2021). As a result, a party seeking a temporary restraining order must show "that he [or she] is

likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction

is in the public interest." *Id.* at 677–78 (quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015)

(alterations in original)). To demonstrate a likelihood of success on the merits, "[a] movant . . .

need not show that success is an absolute certainty. He need only make a showing that the

probability of his prevailing is better than fifty percent. There may remain considerable room for

doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (citations omitted),

*overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

"The purpose of a temporary restraining order is to preserve an existing situation *in status

quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary

injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (quoting *Pan Am.*

*World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, PAA Chapter*, 306 F.2d 840, 842 (2d Cir.1962)).

"The court may issue a temporary restraining order without written or oral notice to the adverse

party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show

that immediate and irreparable injury, loss, or damage will result to the movant before the

adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any

efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P.

65(b)(1); *see Standard Microsystems Corp. v. Texas Instruments, Inc.*, 916 F.2d 58, 62 (2d Cir.

1990) ("Where speed is needed, the rules of procedure provide for temporary restraining orders,

even without notice, to prevent irreparable harm." (citing Fed. R. Civ. P. 65)). "The restrictions

on the availability of *ex parte* temporary restraining orders imposed by Rule 65(b) are stringent

and must be scrupulously honored*." Fed. Trade. Comm'n v. Grand Teton Pros., LLC*, 2019 WL

4439501, at *2 (D. Conn. 2019) (internal quotation marks and citations omitted) (citing *Granny*

*Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of*

*Alameda Cty.*, 415 U.S. 423, 438-39 (1974); *Austin v. Altman*, 332 F.2d 273, 275 (2d Cir. 1964)).

## III.    CONCLUSIONS OF LAW

The Defendants argue that their motion for a temporary restraining order and preliminary

injunction should be granted because: (1) they prevail on the merits, (2) they will suffer

irreparable harm absent a temporary restraining order, (3) the balance of the equities (or

hardships) favors are in their favor, and (4) the public interest will be served by granting a

restraining order. *See* Mot. at 15, 18, 33, 34.[3]

The Court will address each point in turn.

---

[3] Where a document's internal page numbers conflict with the ECF-generated pagination, the
Court refers to the ECF-generated pagination.

**A. Likelihood to Succeed on the Merits**

Before issuing a preliminary injunction, "a district court must consider whether plaintiffs have demonstrated that they are likely to prevail on the merits[,]" of their claims. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

"[Parties] do not need to show that there is a likelihood of success on the merits of all of their claims, rather, they need only show a likelihood of success on the merits of at least one claim." *Du v. United States Dep't of Homeland Sec.*, No. 3:25-CV-644 (OAW), 2025 WL 1549098, at *8 (D. Conn. May 31, 2025) (citing *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)); *see also New York Pathological & X-Ray Lab'ys, Inc. v. Immigr. & Naturalization Serv.*, 523 F.2d 79, 82 (2d Cir. 1975) ("[T]here appears to be a sufficient likelihood of the appellants' success on the merits of at least one claim to justify preliminary injunctive relief.").

"In determining whether a plaintiff has demonstrated a likelihood of success on the merits of the 'ultimate case, a court is not called upon finally to decide the merits of the controversy. It is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief.'" *Synergy Advanced Pharms., Inc. v. CapeBio, LLC*, No. 10 CIV. 1736(SAS), 2010 WL 2194809, at *4 (S.D.N.Y. June 1, 2010) (quoting *Gibson v. U.S. Immigration & Naturalization Serv.*, 541 F.Supp. 131, 137 (S.D.N.Y.1982)).

The Defendants have asserted various counterclaims against the Plaintiffs including: (1) a declaratory judgment claim on the scope of the agreement between Beyond the Dog and Dr. Salzer, (2) CUPTA claims for unfair acts and practices and unfair methods of competition, (3) tortious interference claims for interfering with an advantageous prospective contractual

17

relationship that is injurious to one's reputation and interference with contractual relations, (4) defamation *per se*, (5) a common law claim of unfair competition, and (6) a claim of negligent infliction of emotional distress. *See* Amended Answer at 62–81. For the purposes of deciding whether the Defendants will prevail on the merits of their claims, the Court will lay out the legal standard for each of the Defendants' claims.

First, under the Declaratory Judgment Act "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Sunvestment Energy Grp. NY 64 LLC v. Nat'l Grid USA Servs. Co.*, 116 F.4th 106, 113 (2d Cir. 2024) (citing 28 U.S.C. § 2201(a)).

In determining whether declaratory relief is appropriate, a court should consider, to the extent appropriate, "(1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023) (cleaned up).

Second, in order to prevail on a CUPTA claim, the Defendants must show that the Plaintiffs "(1) engaged in unfair methods of competition or unfair or deceptive acts or practices

(2) in the conduct of any trade or commerce, (3) resulting in (4) an ascertainable loss of money or property, real or personal, by the plaintiff." *Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 357 A.3d 874, 889 (Conn. 2021).

Third, in order to prevail on a tortious interference claim, the Defendants must show: "(1) a business relationship between the [Defendants] and another party; (2) the [Plaintiffs'] intentional interference with the business relationship while knowing of the relationship; and (3) [that] as a result of the interference, the [Defendants] suffer[] actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000) (citations omitted)

Fourth, in order to prevail on a defamation *per se* claim the Defendants must show that "(1) the [Plainitffs] published a defamatory statement; (2) the defamatory statement identified the [Defendants] to a third person; (3) the defamatory statement was published to a third person; and (4) the [Defendants'] reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 969 A.2d 736, 742 (Conn. 2009) (citation omitted). However, "[w]hen the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. The plaintiff is required neither to plead nor to prove it. Whether a publication is libelous per se is a question for the court." *Id.* (cleaned up) (quoting *Lowe v. Shelton*, 851 A.2d 1183, 1195 (Conn. App. 2004), *cert. denied*, 859 A.2d 568 (Conn. 2004).

Fifth, an unfair competition claim under Connecticut law is an umbrella term for "a number of related torts involving improper interference with business prospects." *Larsen Chelsey Realty Co. v. Larsen*, 656 A.2d 1009, 1022 at n.23 (Conn. 1995) (quoting W. Prosser & W. Keeton, Torts (5th Ed.1984) § 130, p. 1013). The exact "extent of common law unfair competition under Connecticut law is somewhat unclear[,]" *Anthem Sports, LLC v. Under the*

19

*Weather, LLC*, 320 F. Supp. 3d 399, 420 (D. Conn. 2018), and so are the elements or general requirements of such a claim. However, given that a discussion of what the Defendants must show to prevail on a common law unfair competition claim is not necessary to the Court's ruling here, *see infra* at 23 ("Accordingly, because the Defendants are likely to succeed on at least one claim, including the Defendants' declaratory judgment and CUPTA claims, the Defendants are likely to succeed on the merits without considering their likelihood of success on their other claims."), the Court does not attempt to take on the seemingly novel issues of defining what the elements of a Connecticut unfair competition claim are here. *See, e.g.*, *Merritt v. United States*, 592 F. Supp. 3d 340, 354 (D. Vt. 2022) ("Federal courts asked to rule on an unsettled question of state law should do so only where an answer to the question is necessary for a decision."); *Flynn v. Cable News Network, Inc.*, 621 F. Supp. 3d 432, 441 (S.D.N.Y. 2022) ("It was unnecessary for the Court to decide this complex state law issue, and the Court declines to do so here."); *see also Hughes v. Equity Off. Props. Tr.*, 245 F. App'x 88, 90 (2d Cir. 2007) (refusing to reach an issue of state law over tolling when it was "a question of state law which we need not reach"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . .").

And finally, in order to prevail on a negligent infliction of emotional distress claim, the Defendants must prove that: "(1) the [Plaintiffs'] conduct created an unreasonable risk of causing the [Defendants] emotional distress; (2) the [Defendants'] distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the [Plaintiffs'] conduct was the cause of the [Defendants'] distress." *Kleftogiannis v. Inline Plastics Corp.*, 411 F. Supp. 3d 216, 227 (D. Conn. 2019) (quoting *Hall v. Bergman*, A.2d 666, 674 n.8 (Conn. 2010)).

The Defendants argue that they will prevail on the merits of their declaratory judgment, CUPTA, and tort claims, respectfully, because: (1) "[b]y the plain terms of the contract and as a matter of law, Dr. Salzer's non-compete and non-disclosure obligation ended on March 22, 2025[,]" Mot. at 20; (2) the "Plaintiff's engaged in unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce, resulting in an ascertainable loss of money or property, real or personal, by the plaintiff[,]" *id.* at 21 (internal quotation marks and numbers omitted); and (3) "Plaintiffs knew of Defendants contracts with MSPCA and Our Companions[,] Plaintiffs intentionally and unjustifiably interfered with those relationships with the intention of harming Defendants' business and destroying her reputation so they could compete unfairly with Defendants[, . . .] Plaintiffs, specifically Sean Savage, told a third party located in Connecticut that Dr. Salzer stole BTD information and was using that information in her business[, and] [t]his statement was false and was made to injure Dr. Salzer in trade, occupation, and profession." Mot. at 33.

In response, the Plaintiffs argue that Dr. Salzer's "[CUPTA] claim is unsupported by both the law and the factual record[,]" Opp'n at 18, and that Dr. Salzer "[i]s [n]ot [l]ikely to [s]ucceed on [h]er [t]ortious [i]nterference, [u]nfair [c]ompetition and [d]efamation [c]laims." *Id.* at 20

The Court disagrees.

First, regarding the Defendants' declaratory judgment claim, the Court has already found that Dr. Salzer's non-compete, and non-disclosure obligations have ended. *See* Order, ECF No. 121 (June 12, 2025) ("[P]aragraphs 1(A)-(C) of the Trainer Non-Compete Agreement are no longer in effect."). Defendants thus have a high likelihood of success on their declaratory judgment claim. *See, e.g.*, *Wells Fargo Bank, Nat'l Ass'n as Tr. for Holders of COMM 2014-CCRE15 Mortg. Tr. Com. Mortg. Pass-Through Certificates v. 840 Westchester Ave. NMA, LLC,*

No. 1:24-CV-07680 (JLR), 2025 WL 1455760, at *9 (S.D.N.Y. May 21, 2025) ("Plaintiff has shown a high likelihood of success on the merits — indeed, the Court has granted summary judgment in favor of Plaintiff on its foreclosure claim.").

Second, "[i]n determining whether a method of competition or business practice violates CUTPA, Connecticut courts follow the 'cigarette rule' formerly used by the Federal Trade Commission. Under this rule, courts must consider three factors: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers, competitors or other businesspersons." *Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, 665 F. Supp. 3d 236, 253–54 (D. Conn. 2023) (*citing Kent Literary*, 257 A.3d 874 at 899).[4]

Court have held that "usurpation of corporate opportunities violate[s] CUTPA." *Zhao v. Dean*, No. FSTCV196042813S, 2020 WL 1031613, at *2 (Conn. Super. Ct. Jan. 31, 2020) (citing among others *Ostrowski v. Avery*, 703 A.2d 117, 129 (Conn. 1997) ("In *Larsen*, a case involving claims of breach of fiduciary duty, unfair competition, theft of a corporate opportunity and tortious interference with a business relationship, we concluded that the trial court had improperly set aside the jury's finding of a CUTPA violation.")) (collecting cases).

---

[4] "Under CUTPA, deceptive practices are a subset of unfair practices such that pleading a deceptive practice will establish a claim of unfairness." *Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91, 100 n.2 (D. Conn.) (citing *Edwards v. N. Am. Power & Gas, LLC*, 120 F.Supp.3d 132, 141 n.4, (D. Conn. Aug. 4, 2015) (citing *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (1988))), *aff'd*, 666 F. App'x 84 (2d Cir. 2016).

Because the Savages encouraged Mr. McClutchy to go undercover as a customer to Dr. Salzer's business, which deceived Dr. Salzer into spending time and resources on him that could have been spent on potential customers, Defendants have shown a likelihood to succeed on the merits on their CUPTA claims. *See supra* at 9–10 (the Court laying out its findings of facts about Mr. McClutchy's undercover operation); Transcript of July 14, 2025, hearing on preliminary injunction and temporary restraining order, ECF No. 146 at 157–170 (July 20, 2025) ("Hearing Tr.") (Mr. McClutchy's hearing testimony); *see cf. CIT Grp./Equip. Fin., Inc. v. Quality Design & Mfg., LLC*, No. CV044000970S, 2007 WL 1470302, at *4 (Conn. Super. Ct. May 3, 2007) ("In both *Bordieri* and *Carbonella*, the court held that the plaintiffs did not properly allege a CUTPA claim because although they alleged a § 35-1 violation, they failed to allege that . . . they were unaware of the real party with whom they were contracting."); *see also Bishop v. Paine Webber, Inc.*, No. 331709, 1999 WL 596248, at *4 (Conn. Super. Ct. July 28, 1999) ("However, the cases which uphold a CUTPA claim, but do not involve a consumer relationship, deal with competitors who use deceptive methods to divert clients or trade away from honest business people."); *Serv. Rd. Corp. v. Quinn*, 698 A.2d 258, 265 (Conn. 1997) ("[i]n the business context, a plaintiff asserting a CUTPA claim may satisfy the ascertainable loss requirement of § 42–110g by establishing, through a reasonable inference, or otherwise, that the defendant's unfair trade practice has caused the plaintiff to lose potential customers.").

Accordingly, because the Defendants are likely to succeed on at least one claim, including the Defendants' declaratory judgment and CUPTA claims, the Defendants are likely to succeed on the merits without considering their likelihood of success on their other claims. *See, e.g.*, *Home It, Inc. v. Wen*, No. 19CV7070MKBVMS, 2020 WL 353098, at *5 (E.D.N.Y. Jan. 21, 2020) ("For the reasons discussed infra, the Court finds that Plaintiff has demonstrated a

23

likelihood of success on the merits for its third claim. Accordingly, it will not address Plaintiff's other claims."); *Nat'l Job Corps Ass'n v. Dep't of Lab.*, No. 1:25-CV-04641-ALC, 2025 WL 1752414, at *8 n.9 (S.D.N.Y. June 25, 2025) ("In addition, because the party moving for an injunction need only demonstrate a likelihood of success on at least one of their claims, the Court declines to rule on Plaintiffs' arguments that Defendants actions violate the Impoundment Control Act, the separation of powers, are arbitrary and capricious, and are ultra vires at this stage in the proceedings, as it does not impact the Court's analysis of the preliminary injunction.").

### B. Irreparable Harm

For irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations and internal quotation marks omitted); *see also L.A. v. Lyons*, 461 U.S. 95, 111–12 (1983) (holding that a court cannot find injunctive relief if the claimed injury is speculative or remote). "The relevant [irreparable] harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction. . . . Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d. Cir. 2010).

The Defendants argue that they will suffer irreparable harm without a stay because "Plaintiffs' conduct has already led to Dr. Salzer developing a post-traumatic stress disorder diagnosis which will only get worse if Plaintiffs are permitted to continue stalking, covertly investigating, try to entrap, and improperly interfere in Defendants' business. [And] this conduct also threatens to destroy Defendants' business and Dr. Salzer's practice given that Plaintiffs have

24

interfered with and tried to destroy her professional reputation and business relationships." Mot. at 16.

In response, the Plaintiffs argue that "Salzer fails to provide any evidence she will be successful on the merits and cannot demonstrate any irreparable harm. Salzer's alleged harms are not actual and imminent, but rather, speculative and remote." Opp'n at 3.

In reply, the Defendants argue that "a full day of testimony from eight witnesses confirmed that the Savages' harassing conduct did occur, that Dr. Salzer suffered a loss as a result, that the conduct will continue to occur, that counsel lied to the Court, and that counsel was involved in the harassing activities both before and after the Court's June 12, 2025 order." Supp. Mem. at 10.

In further response, the Plaintiffs argue that "Dr. Salzer failed to provide any credible evidence of any harm, let alone irreparable harm, at the July 14, 2025, preliminary injunction hearing or in her memorandum of law supporting her motion for a preliminary injunction. At best, Dr. Salzer's alleged harms are purely speculative and remote and are insufficient to satisfy her heightened burden." Supp. Opp'n at 3.

In further reply, the Defendants argue that "BTD's repeated assertion that Dr. Salzer presented no evidence to establish irreparable harm is wrong. Dr. Salzer's Memorandum in Support of Motion for a Preliminary Injunction provided extensive citation to the record evidence. Starting with the letter to the MSPCA, Our Companions, the McClutchy investigation, and culminating so far in the Kansas University investigation, the evidence at the hearing was not only extensive, but it was also largely undisputed." Reply to Supp. Opp'n at 2 (internal citation omitted).

Finally, the Plaintiffs argue that "[t]he record is clear: Dr. Salzer did not, has not and will not suffer irreparable harm." Reply to Supp. Mem. at 2.

The Court disagrees.

A monetarily incalculable reputational harm and loss of business opportunities can constitute irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("The district court found it impossible to estimate 'with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of Register.com's relationships with customers and co-brand partners,' by reason of Verio's actions. In our view, the district court did not abuse its discretion in finding that, unless specific relief were granted, Verio's actions would cause Register irreparable harm through loss of reputation, good will, and business opportunities.") (internal citation omitted); *see also Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 40 (S.D.N.Y. 2020) ("Courts have determined that a loss of existing business and a decline in the opportunity for new business may qualify as irreparable harm.") (citing cases); *compare Country Fare LLC v. Lucerne Farms*, No. 11-cv-722, 2011 WL 2222315, at *5 (D. Conn. June 7, 2011) ("It is well recognized that the inability of a party to supply its products to customers as a result of a dispute will often result in a loss of goodwill sufficient to establish irreparable harm.").

Indeed, "[i]t is well established in this Circuit that the loss of client relationships and customer goodwill ... generally constitutes irreparable harm*." loanDepot.com, LLC v. CrossCountry Mortg., LLC*, No. 22 CIV. 5971 (LGS), 2023 WL 3884032, at *4 (S.D.N.Y. June 8, 2023) (citing *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 105 (S.D.N.Y. 2021)). "[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to

come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). "To satisfy the irreparable

harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will

suffer 'an injury that is neither remote nor speculative, but actual and imminent[.]'" *Grand River*

*Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

Here, Dr. Salzer complains—and the evidence presented at the preliminary injunction

hearing confirms—that "[the Plaintiffs'] conduct [] threatens to destroy Defendants' business

and Dr. Salzer's practice given that Plaintiffs have interfered with and tried to destroy her

professional reputation and business relationships." *See, e.g.*, Hearing Tr. at 73:16–17, 74:25–

75:3 ("Q. Sorry, did you advertise a lecture series with Dr. Salzer? A. Yes, we advertised it, yes.

. . . THE WITNESS: I made a decision to pull the lecture series. Q. (Ms. Sebastia) Why did you

do that? A. Because of my interaction with the Savages, and because of my knowledge of what

was happening legally.") (Testimony from Peyton Winter, Director of Canine Behavior

Programs at Our Companions); *id.* at 152:22–153:9 ("Q. Describe the impact of the Dan

McClutchy undercover operation. How did that impact you? A. Once I was made aware that Dan

McClutchy was not a real client, it rocked my business to its core. I cannot trust that individuals

that are calling me to seek help for their dogs are true clients that are seeking help for their dogs

rather than maybe someone that is out to get me. When I found out that the dog didn't exist and

that he was requesting for me to work with his mom's dog, that did not exist, without her

informed consent, I was concerned that my credentials as a board certified behavior analyst

would be called into question, given that one of the criteria components for our ethics code is

informed consent.") (Testimony from Dr. Salzer).

Even the harm from the removal of Dr. Salzer's dissertation from the University of

Kansas' database is not too speculative to constitute irreparable harm. *See* ((quoting *Freedom*

*Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)). *See, e.g. Doe v. Yale Univ.*, No. 3:25-CV-787 (OAW), 2025 WL 1733401, at *12 (D. Conn. June 23, 2025) ("Defendants contest the notion that the dissertation is of great import in the academic job market. There was testimony at the hearing from several professors that it was more important to show consistent work product . . . . But more persuasive on this point is the already-extensive documentary record in this case, which shows that Plaintiff has been pursuing academic positions (including tenure-track positions) for years, even without a dissertation, and more importantly, that she appears to have been a competitive candidate. And perhaps most persuasive of all are the several points in the record where multiple actors reference how unfavorable the academic job market has been in recent years. Thus, it is not clear that any difficulty Plaintiff may have in securing a new situation is attributable to Defendants' actions.")

As a result, the loss of professional reputation and business opportunities that Dr. Salzer suffered from the Plaintiffs' actions constitutes irreparable harm.

Accordingly, the Defendants are likely to suffer irreparable harm absent an injunction.

## C. Balance of the Equities and Hardships

"[A] court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) and *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

In balancing the equities and hardships a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[.]" *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (quoting *Winter*, 555 U.S. at 24).

The Defendants argue that the balance of the equities is in their favor because they "simply want to be left alone to pursue their business in peace." Mot. at 34.

The Plaintiffs argue that "BTD's actions were justified and necessary to protect its proprietary interests, and Salzer offers no evidence that the . . . equities favor them." Opp'n at 21 (internal citation omitted).

The Defendants further argue that "counsel's representations at face value that the Savages would not harass Dr. Salzer during this litigation . . . . was false[,]" Supp. Mem. at 22, and that "[i]f the Court does not grant Dr. Salzer's motion for an injunction, who knows what new avenues for harassment the Savages will dream up next." *Id.* at 23.

The Court agrees.

In balancing the equities and hardships, the Court considers the relief requested, the potential injuries or effects on each party from said relief, and whether the balance of those injuries or effects weighs in favor of granting the requested relief. *See, e.g.*, *Beyond Gravity Sweden AB v. Ensign-Bickford Aerospace & Def. Co.*, No. 3:24-CV-2021 (OAW), 2025 WL 540468, at *8 (D. Conn. Feb. 19, 2025) (balancing hardships by considering injuries that to both parties if restraining order was or was not granted). Dr. Salzer seeks to restrain the Plaintiffs from: (1) participating in various harassing behaviors towards Dr. Salzer; (2) communicating with any of Dr. Salzer's employers or business relationships; and (3) "defaming" Dr. Salzer. *See* Mot. at 36.

Any harassing behavior, such as intentionally deploying agents with false identities, or stalking Dr. Salzer, would lean the equities towards restraining the Plaintiffs from any such actions. *Cf.* Conn. Gen. Stat. § 53a-183(a) ("A person is guilty of harassment in the second degree when with intent to harass, terrorize or alarm another person, and for no legitimate

purpose, such person: (1) Communicates with a person by telegraph or mail, electronically

transmitting a facsimile through connection with a telephone network, electronic mail or text

message or any other electronically sent message, whether by digital media account, messaging

program or application, or otherwise by computer, computer service or computer network, as

defined in section 53a-250, or any other form of communication, in a manner likely to cause

terror, intimidation or alarm; (2) makes a telephone call or engages in any other form of

communication, whether or not a conversation ensues, in a manner likely to cause terror,

intimidation or alarm; or (3) communicates or shares a photograph, video or words or engages in

any other form of communication to a digital, electronic, online or other meeting space, in a

manner likely to cause terror, intimidation or alarm."); *Ideavillage Prods. Corp. v. Bling*

*Boutique Store*, No. 16-CV-9039 (KMW), 2017 WL 1435748, at *5 (S.D.N.Y. Apr. 21, 2017)

("Where the only hardship to the Moving Defendants from this Preliminary Injunction would be

to prevent the Moving Defendants 'from engaging in further illegal activity,' the balance of

hardships clearly tips in Plaintiff's favor."); *DISH Network L.L.C. v. DelVecchio*, 831 F. Supp. 2d

595, 601–02 (W.D.N.Y. 2011) ("The only hardship to Defendant from this injunction would be

to prevent him from engaging in further illegal activity, so the balance clearly weighs in

Plaintiffs' favor.").

  Here, the Defendants seek to restrain the Plaintiffs from "deploying agents to falsely

assert themselves as potential clients of Defendants[;]" "communicating with Defendants'

employers at the MSPCA and Our Companions or with any other of Dr. Salzer's employers or

business relationships for any purpose;" "following, or engaging agents to follow, Dr. Salzer,

park outside her house, places of employment, or at her clients' houses, or otherwise

communicating or speaking with Dr. Salzer;" and "telling any third party that Dr. Salzer

breached her contract with BTD or misappropriated trade secrets or confidential information or otherwise defaming Dr. Salzer." Mot. at 36. They also seek to restrain the Plaintiffs' from communicating with any of "Dr. Salzer's employers or business relationships for any purpose[.]" Mot. at 36. Finally, the Defendants seek to restrain the Plaintiffs from "telling any third party that Dr. Salzer breached her contract with BTD or misappropriated trade secrets or confidential information or otherwise defaming Dr. Salzer." Mot. at 36.

On this record, the Savages' actions, including their communications with Dr. Salzer's employers, negatively affected her employment. *See* Hearing Tr. at 32:24–33:5 ("A. A restraining order was put in place. Q. At the MSPCA? A. Yes. Q. Can you please explain what was, what happened? A. Because Dr. Salzer was afraid that she was being watched, that clients who were fake clients were in danger of approaching her.") (Testimony from Dr. Terri Bright); *id.* at 33:24–34:1 ("THE WITNESS: So staff meetings, when she was talking about not feeling safe, she was emotional. When she spoke to me, she was tearful. She was afraid.") (same); *id.* at 43:25–44:5 ("I had to have conversations with [HR] about [the letter from the Savages about the potential of trade secrets being used by Dr. Salzer], and so it kind of leaves a black cloud over her application. Here I had told them I have this amazing new employee who is followed by a legal letter saying please help avoid any issues down the road. That is kind of a landmine, you know, planted in her HR file forever.") (same); *id.* at 73:16–17, 74:25–75:3 ("Q. Sorry, did you advertise a lecture series with Dr. Salzer? A. Yes, we advertised it, yes. . . . THE WITNESS: I made a decision to pull the lecture series. Q. (Ms. Sebastia) Why did you do that? A. Because of my interaction with the Savages, and because of my knowledge of what was happening legally.") (Testimony from Peyton Winter); *id.* at 77:20–25, 78:10–79:2 ("I made a decision not to put Our Companions in the middle of this. I didn't want it to be promoted publicly, which we would

have. We would have posted it on our public YouTube access. I didn't want to have any sort of comments, interactions, concerns, emails sent to me. . . . Yes, we had an educational training plan being coordinated with animal control officers to do risk dog assessment and fake dog resource pieces. It was slotted to occur this summer, and that entire series was canceled by nature of Ally taking a leave of absence. . . . Ally's on an indefinite leave of absence from Our Companions, and I don't know when it started, but it caused a lot of things to be canceled.") (same).

The actions of the Plaintiffs also resulted in the University of Kansas' removal of Dr. Salzer's dissertation. *See* Hearing Tr. at 215:9, 215:12–18 ("THE COURT: . . . you are prepared to stipulate -- you are prepared to stipulate you were authorized by your clients to contact University of Kansas? MR. DENNING: To have the dissertation removed. MR. DUHL: They authorized counsel, yes. MR. DENNING: To have the dissertation removed? THE COURT: So stipulate so we don't have to go through it. MR. DENNING: Thank you, Your Honor."); *see id.* at 141:5–10 ("Q. (Ms. Cassidy) . . . what happened a week and a half ago? A. I received an email from KU Scholarworks identifying that my dissertation was going to be removed from KU Scholarworks for potential copyright infringement and there would be an investigation pending.").

While the Savages argue that these actions were taken in defense of their trade secrets, given the specious nature of the evidence and arguments presented in support of their trade secrets, *see* Hearing Tr. at 241:19–275:20 (examination of Dr. Echterling-Savage concerning the number, matter, and the publicized nature of various of Beyond the Dog's alleged trade secrets); *see supra* at 12–14 (discussing the Court's factual findings regarding BTD's alleged trade

secrets),[5] and the direct evidence of the harm to Dr. Salzer's employment, due to the Savage's

actions, *see supra* at 24–28, the balance of the equities leans in favor of the Defendants, and in

favor of restraining the Plaintiffs from communicating with any of Dr. Salzer's employers, or

business relationships, or otherwise affecting her professional opportunities in any way,

regarding any of the subject matter of this ongoing lawsuit, including but not limited to the

University of Kansas. *See, e.g.*, *DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 421 (E.D.N.Y.

2021) ("Given the harm Plaintiff has demonstrated, the balance of hardships tips in Plaintiff's

favor."); *see also Bus. Trends Analysts v. Freedonia Grp., Inc.*, 650 F. Supp. 1452, 1462

(S.D.N.Y. 1987) ("BTA has not demonstrated, however, that either its trademark or trade secrets

claims present serious questions for litigation, or that the balance of hardships on the copyright

claim tips decidedly in its favor."); *see cf. Brainwave Sci., Inc. v. Arshee, Inc.*, No. 21-CV-4402

(BMC), 2021 WL 6211630, at *6 (E.D.N.Y. Dec. 14, 2021) ("Because plaintiff is likely to

succeed in its efforts to enforce its protected trade secrets, the relative hardships tip decidedly in

its favor.").

      Even after the Court issued an order on June 12, 2025, warning against harassing

behavior, *see* Order, ECF No. 121 ("Nevertheless, because counsel for Plaintiffs represented to

the Court that no such harassing actions have occurred, if it is subsequently determined that any

---

[5] As noted above, given that the front end was publicly accessible through the posting of Dr. Salzer's dissertation in the University of Kansas library database, a discussion of the back end and the algorithm is publicly accessible through a video of Dr. Salzer on YouTube, and the supposed "entire company" of Beyond the Dog is premised on this algorithm, *see* Hearing Tr. at 266:8–267:22 (Dr. Savage's testimony about the importance of the behavioral assessment algorithm), even after an extensive hearing and considerable briefing, the exact nature of any alleged trade secret of Beyond the Dog remains unclear. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. Information that is public knowledge or that is generally known in an industry cannot be a trade secret.") (internal citations omitted).

such actions did occur before this Order, or after its issuance, appropriate sanctions will issued against the Plaintiffs, and/or their counsel, to the extent warranted."), the Court is not assured that similar behavior will not occur before the conclusion of this case, and thus provides further justification for the balance of the equities weighing in favor of granting the injunction. *See, e.g.*, *Sola Franchise Corp. v. Solo Salon Studios Inc.*, No. 14-CV-0946JSAKT, 2015 WL 1299259, at *18 (E.D.N.Y. Mar. 23, 2015) ("The balance of hardships will generally tip in the plaintiff's favor where 'it has established irreparable harm and that the infringing conduct is likely to continue absent injunctive relief.'") (quoting *AW Indus., Inc. v. Sleepingwell Mattress Inc.*, No. 10-CV-04439 NGG RER, 2011 WL 4404029, at *11 (E.D.N.Y. Aug. 31, 2011), *report and recommendation adopted*, No. 10-CV-04439 NGG RER, 2011 WL 4406329 (E.D.N.Y. Sept. 21, 2011)).

Accordingly, the balance of the equities leans in favor of the Defendants.

### D. Public Interest

In analyzing the public interest prong, a court must consider "the public consequences in employing the extraordinary remedy of injunction" and ensure that the proposed injunction will not harm the public interest. *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24); *see also U.S. S.E.C. v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest.").

The Defendants argue that the public interest will be served by granting a restraining order because "[t]he requested restraining order is necessary to stop Plaintiffs' interference [in the Defendants professional conduct] and protect of the long-acknowledged general public policy favoring robust and uninhibited competition." Mot. at 34.

The Plaintiffs argue that "The public interest is not served by restraining a business from lawfully protecting its trade secrets or defending its rights. [And that] BTD's actions were justified and necessary to protect its proprietary interests, and Salzer offers no evidence that the public interest or equities favor them." Opp'n at 21 (internal citation omitted).

The Court disagrees.

There is certainly a public interest in preventing unfair and unhealthy competition in business relationships. *See Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp.*, 717 A.2d 77, 99 (Conn. 1998) ("The purpose of [the Connecticut Unfair Trade Practices Act] is to protect the public from unfair practices in the conduct of any trade or commerce[.]"); *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1080 (2d Cir. 1990) ("As the Supreme Court observed in *United States v. Line Material Co.*, '[p]ublic policy has condemned monopolies for centuries.' [333 U.S. 287, 308 (1948).] That feeling exists in large measure to this day. Since competition is generally held to benefit the public, any reduction in competition must be considered against the public interest.") (some internal quotation marks and citations omitted).

And given that the Defendants have sufficiently demonstrated irreparable harm suffered from the alleged unfair practices that the Plaintiffs engaged in, *see supra at* 24–28, the public interest weighs in favor of granting the injunction and preventing potentially unfair business practices.[6] *See, e.g., IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL

---

[6] The Plaintiffs argue that the sending of letters to MSPCA and Our Companions, and contacting the University of Kansas should not be the subject of any injunction because "BTD possess an absolute and well-established privilege to communicate, both within and outside of litigation, its good faith belief that Salzer breached contractual obligations and misappropriated BTD's confidential and trade secret information." Opp'n at 9. The assertion of this privilege, however, does not bar the Court's grant of a preliminary injunction in this case. In Connecticut, a litigation privilege "bar[s] defamation claims against all participants in judicial proceedings, including judges, attorneys, parties, and witnesses[, and also bars] . . . a variety of retaliatory civil claims arising from communications or communicative acts occurring in the course of a judicial or

1525486, at *8 (E.D.N.Y. May 13, 2022) ("It goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest.").

Accordingly, all of the factors have been satisfied, and a preliminary injunction will be issued. [7]

---

quasi-judicial proceeding, including, but not limited to, claims for tortious interference, intentional infliction of emotional distress, fraud, and violations of CUTPA." *Deutsche Bank AG v. Vik*, 314 A.3d 583, 594 (Conn. 2024) (internal citations and quotations marks omitted).

But the Court here is not deciding whether certain claims are barred by the litigation privilege, as that issue is properly raised at the motion to dismiss stage. *See Bruno v. Travelers Companies*, 161 A.3d 630, 635, 635 n.6 (Conn. App. 2017) ("Here, once the defendants raised the issue of absolute immunity, based on the application of the litigation privilege, and the court then determined that the plaintiff's initial complaint was barred by the doctrine of absolute immunity, the court should have dismissed the case against the defendants, essentially treating the motion to strike as a motion to dismiss. . . . Given that absolute immunity implicates subject matter jurisdiction, a motion to dismiss is a proper vehicle through which to raise a claim of absolute immunity."). Moreover, under the litigation privilege, "in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." *Deutsche Bank AG*, 314 A.3d at 594 (quoting *Hopkins v. O'Connor*, 925 A.2d 1030, 1042 (Conn. 2007)). Nevertheless, the public policy behind absolute immunity is not supported by protecting baseless or retaliatory actions. *See MacDermid, Inc. v. Leonetti*, 79 A.3d 60, 67 n.7 (Conn. 2013) (holding in the employment context that "[t]he illegitimate use of litigation in such a retaliatory manner subverts the purpose of the judicial system and, as a matter of public policy, we will not encourage such conduct by affording it the protection of absolute immunity."). In this case, there is nothing in this record to suggest that the Plaintiffs had a good faith basis for taking these actions, particularly the actions taken with the University of Kansas, during this litigation when, to the extent relief was warranted, the Plaintiffs could have informed the Court of its necessity, at the very least.  As a result, on this record, there is no basis for the application of the litigation privilege to bar the relief requested by the Defendants. *See, e.g.*, *Simms v. Seaman*, 69 A.3d 880, 890 (Conn. 2013) ("[A]ttorneys are not protected by absolute immunity against claims alleging the pursuit of litigation for the unlawful, ulterior purpose of inflicting injury on the plaintiff and enriching themselves and their client, despite knowledge that their client's claim lacked merit, because such conduct constituted the use of legal process in an improper manner or primarily to accomplish a purpose for which it was not designed.").

[7] In accordance with Fed. R. Civ. Pro. 65(d)(1) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required"), the Court finds that for the reasons stated above in this Ruling

## IV.    CONCLUSION

For the reasons stated below, the Defendants' motion for a preliminary injunction is

**GRANTED**, the motion for a temporary restraining order is **DENIED** as moot, and the Court

orders the following[8]:

---

and Order, the terms of the relief ordered is narrowly tailored to prevent the irreparable harm that Dr. Salzer and her business and professional relationships would suffer in its absence. *See Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("Injunctive relief should be narrowly tailored to fit specific legal violations."); *supra* at 24–28 (analyzing the irreparable harm to Dr. Salzer); *see also supra* at 31–32 ("Even after the Court issued an order on June 12, 2025, warning against harassing behavior, the Court is not assured that similar behavior will not occur before the conclusion of this case, and thus provides further justification for the balance of the equities weighing in favor of granting the injunction.") (internal citations omitted); *see, e.g.*, *JTH Tax, Inc. v. Sawhney*, No. 19-CV-4035 (AJN), 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) ("The Court finds that only the following relief is necessary to ensure that irreparable harm to Plaintiffs' goodwill and business relationships is prevented . . ."); *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 242 (E.D.N.Y. 2024) ("In all cases, the relief should be narrowly tailored to fit specific legal violations and to avoid unnecessary burdens on lawful commercial activity. Here, the Court issues a narrowly tailored injunction . . . . The Court notes again that this strengthened injunction is necessitated by Defendants' violation of the previous injunction.") (internal citations and quotation marks omitted) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp.*, 43 F.3d at 785)).

[8] The issuance of a bond under Fed. R. Civ. Pro. 65(c) does not appear to be required. While Fed. R. Civ. Pro. 65(c) states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained[,]" Rule 65(c) also "gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm . . ." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotation mark omitted) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)). Given that the Defendants do not request a bond, *see* Mot. at 37 ("Therefore, no bond is required."), the likelihood of Dr. Salzer to succeed on the merits, *see supra* at 17–24; *see also Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 203 (E.D.N.Y. 2013) ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant.") (collecting cases), and that there has been no proof of harm to the Plaintiffs from issuance of the injunction, *see, e.g.*, *supra* at 10 (the Court finding that "Sean Savage, however, admitted not having any certainty that Dr. Salzer had used Beyond the Dog's trade secrets, other than thinking that Dr. Salzer had used an intake form similar to Beyond the Dog's [,]" and finding no other evidence of harm), the Court will not issue a bond. *See, e.g.*, *G.F.F. v. Trump*, No. 25 CIV. 2886 (AKH), 2025 WL 1301052, at *11 (S.D.N.Y. May 6, 2025) ("Here, there is no proof of likelihood of harm to Respondents that would result from the issuance of this preliminary injunction, and thus, Petitioners need not post bond.").

1. The Plaintiffs are restrained from deploying agents to falsely assert themselves as potential clients of Defendants to spy on Defendants to improperly investigate Defendants business and obtain Defendants' business documents, or any other covert corporate espionage activities.

2. The Plaintiffs are restrained from communicating with Dr. Salzer's employers at the MSPCA and Our Companions or with any other of Dr. Salzer's employers or business relationships regarding Dr. Salzer or the claims of this litigation except for the purposes of discovery.

3. The Plaintiffs are restrained from following, or engaging agents to follow, Dr. Salzer, park outside her house, places of employment, or at her clients' houses, or otherwise communicating or speaking with Dr. Salzer.

4. The Plaintiffs are restrained from telling any third party that Dr. Salzer breached her contract with Beyond the Dog or misappropriated trade secrets or confidential information.

5. The Plaintiffs are restrained from initiating or otherwise promoting further proceedings with the University of Kansas regarding the issues of this litigation, and are to provide the relevant officials at the University of Kansas a copy of this Ruling and Order.

The above orders will remain in place until the resolution of the claims in this case, or until the Court orders them no longer necessary.

**SO ORDERED** at New Haven, Connecticut, this 22nd day of August, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE