**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BEYOND THE DOG, LLC,<br>        *Plaintiff*,<br><br>        v.<br><br>ALLYSON SALZER and CANINE<br>BEHAVIORAL BLUEPRINTS, LLC,<br>        *Defendants*. | No. 3:24-cv-1439 (VAB) |
| ALLYSON SALZER and CANINE<br>BEHAVIORAL BLUEPRINTS, LLC,<br>        *Counterclaim-Plaintiffs*,<br><br>        v.<br><br>BEYOND THE DOG, LLC, KRISTYN<br>ECHTERLING-SAVAGE, and SEAN<br>SAVAGE,<br>        *Counterclaim-Defendants*. | |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Beyond the Dog, LLC ("Beyond the Dog", the "Plaintiff,' or "BTD"), Dr. Kristyn

Echterling-Savage, and Sean Savage (collectively, the "Counterclaim-Defendants"), on the one

hand, and Allyson Salzer and Canine Behavioral Blueprints, LLC ( the "Defendants" and

"Counterclaim-Plaintiffs"), on the other, are engaged in a business dispute arising from their

prior working relationship and involving claims for trade secret misappropriation, breach of

contract, unjust enrichment, unfair competition, and related counterclaims. See Amended

Complaint, ECF No. 34 (Jan. 13, 2025) ("Am. Compl.").

1

Pending before the Court are the Defendants' motion for summary judgment, ECF No. 151, and the Plaintiffs' motion for summary judgment as to Defendants' counterclaims, ECF No. 180.

For the following reasons, Dr. Salzer's and Canine Behavioral Blueprints' motion for summary judgment, ECF No. 151, is **GRANTED** in part and **DENIED** in part.

Beyond the Dog's federal and Missouri misappropriation of trade secret claims, the unjust enrichment claim and the federal and Missouri unfair competition claims are **DISMISSED**.

Beyond the Dog's breach of contract claim will proceed to trial, but all post-employment obligations under any of the terms of the Trainer Non-Compete Agreement ended on March 23, 2025, and this claim is limited to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement.

Beyond the Dog's, Dr. Echterling-Savage's, and Sean Savage's motion for summary judgment, ECF No. 180, is **DENIED**.

Dr. Salzer's and Canine Behavioral Blueprints' counterclaims also will proceed to trial.

As to the declaratory judgment counterclaim, consistent with the scope of Beyond the Dog's breach of contract claim, Sections 1(E) and 1(F) of the Trainer Non-Compete Agreement are subject to the two-year limitation applicable to Sections 1(A), 1(B), and 1(C), and all post-employment obligations under the Trainer Non-Compete Agreement ended on March 23, 2025.

But there is a genuine issue of fact as to the Trainer Non-Compete Agreement, limited to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described

2

in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

Beyond the Dog is a dog-training business based in Kansas City, Missouri. Defs.' L.R. 56(a)(1) Stmt. ¶ 1, ECF No. 152; Defs.' L.R. 56(a)(2) Stmt. at 2, ECF No. 224. Allyson Salzer joined Beyond the Dog in 2018 while pursuing her Ph.D. at the University of Kansas. Defs.' Opp'n to Pls.' Mot. for Summ. J. & Cross-Mot. Under Rule 56(f)(1) for Summ. J. ("Defs.' Opp'n") at 4, ECF No. 223; Defs.' L.R. 56(a)(2) Stmt. at 25, ECF No. 224. In connection with her work, Dr. Salzer signed the Trainer Non-Compete Agreement /Employment Agreement, which contained restrictive covenants, confidentiality provisions, and a carveout for "[a]ctivities solely for academic purposes and not-for-profit." Ex. C, ECF No. 152-4; Pls.' L.R. 56(a)(1) Stmt. ¶¶ 5–9, ECF No. 181. During Dr. Salzer's employment, Dr. Kristyn Echterling-Savage supervised Dr. Salzer and worked with her on dissertation-related research. Defs.' Opp'n at 4–5, ECF No. 223; Defs.' L.R. 56(a)(2) Stmt. at 26, ECF No. 224. Dr. Salzer later completed her dissertation, which was published through the University of Kansas. Defs.' Opp'n at 5, ECF No. 223; Ex. 173-14, ECF No. 173-14.

Dr. Salzer left Beyond the Dog in March 2023, moved to Connecticut, began working with the Massachusetts Society for the Prevention of Cruelty to Animals ("MSPCA") and Our Companions, and opened Canine Behavioral Blueprints, LLC ("CBB"). Pls.' L.R. 56(a)(1) Stmt. ¶ 10, ECF No. 181; Defs.' Opp'n at 5, ECF No. 223; Defs.' L.R. 56(a)(2) Stmt. at 27, ECF No. 224. After that move, the relationship between the parties here deteriorated.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage claim that they later took steps to protect contractual and confidentiality interests they believed remained in effect, including sending a letter to the MSPCA, communicating with Daniel McClutchy about CBB, and attending a public Our Companions seminar presented by Dr. Salzer. Pls.' L.R. 56(a)(1) Stmt. ¶¶ 14–19, 23–52, ECF No. 181.

Dr. Salzer and CBB claim that those events interfered with Dr. Salzer's professional opportunities and contributed to the cancellation of her lecture series and the end of her work with Our Companions. Defs.' Opp'n at 5–7, ECF No. 223; Defs.' L.R. 56(a)(2) Stmt. at 20, 30–31, ECF No. 224.

Beyond the Dog and Dr. Salzer sharply dispute the existence, scope, and use of any Beyond the Dog trade secret. Beyond the Dog argues that the client-facing intake questionnaire is not itself the trade secret and that the alleged trade secret instead lies in the non-public back-end scoring matrix, thresholds, logic, protocol-linked outputs, and proprietary assessment report used to translate intake responses into recommendations. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 7–10, ECF No. 172; Pl.'s L.R. 56(a)(2) Stmt. at 3–7, ECF No. 173; Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶¶ 41–102, ECF No. 285.

Beyond the Dog also argues that the July 2025 productions showed Dr. Salzer retained Beyond the Dog materials after her employment ended. Pls.' L.R. 56(a)(1) Stmt. ¶ 62, ECF No. 181; Pl.'s Suppl. L.R. 56(a)(2) Stmt., ECF No. 285.

Dr. Salzer and CBB argue that the specifically identified materials were public, were authorized for dissertation or other academic use, or were not used post-employment. Defs.' L.R. 56(a)(1) Stmt. ¶¶ 2–24, ECF No. 152; Defs.' L.R. 56(a)(2) Stmt. at 2–3, 24–25, ECF No. 224; Defs.' Reply, ECF No. 183.

In moving for summary judgment on the counterclaims, Beyond the Dog, Dr. Echterling-Savage, and Sean Savage further argue that the MSPCA letter accurately reflected the contractual restrictions they believed remained in effect, that Sean Savage's contacts with McClutchy and Our Companions were limited, and that the record does not support the factual basis for several of Dr. Salzer's counterclaim theories, including surveillance, recommendation-letter, and PTSD-related allegations. Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 180-1; Pls.' L.R. 56(a)(1) Stmt. ¶¶ 15–21, 39–61, ECF No. 181.

Dr. Salzer and CBB dispute those assertions and maintain that Plaintiffs' conduct was wrongful and caused compensable harm. Defs.' Opp'n, ECF No. 223.

**B. Procedural Background**

On July 25, 2025, Allyson Salzer and Canine Behavioral Blueprints, LLC filed a motion for summary judgment and a Local Rule 56(a)(1) statement. Mot. for Summ. J., ECF No. 151; Defs.' L.R. 56(a)1 Stmt., ECF No. 152. On the same day, Allyson Salzer and Canine Behavioral Blueprints, LLC also filed a memorandum in support of that motion. Defs.' Mem. in Supp., ECF No. 151-1.

On August 22, 2025, the Court issued its Ruling and Order on Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 168 ("PI Ruling"). The Court granted a preliminary injunction against the Plaintiffs and ordered the following:

(1) The Plaintiffs are restrained from deploying agents to falsely assert themselves as potential clients of Defendants to spy on Defendants to improperly investigate Defendants business and obtain Defendants' business documents, or any other covert corporate espionage activities;

(2) The Plaintiffs are restrained from communicating with Dr. Salzer's employers at the MSPCA and Our Companions or with any other of Dr Salzer's employers or business relationships regarding Dr. Salzer or the claims of this litigation except for the purposes of discovery;

(3) The Plaintiffs are restrained from following, or engaging agents to follow, Dr. Salzer, park outside her house, places of employment, or at her clients' houses, or otherwise communicating or speaking with Dr. Salzer;

(4) The Plaintiffs are restrained from telling any third party that Dr. Salzer breached her contract with Beyond the Dog or misappropriated trade secrets or confidential information; and

(5) The Plaintiffs are restrained from initiating or otherwise promoting further proceedings with the University of Kansas regarding the issues of this litigation, and are to provide the relevant officials at the University of Kansas a copy of this Ruling and Order.

On August 29 and 30, 2025, Beyond the Dog, LLC filed its memorandum in opposition and Local Rule 56(a)(2) materials. Pl.'s Opp'n, ECF No. 172; Pl.'s L.R. 56(a)2 Stmt., ECF No. 173.

On September 11, 2025, Beyond the Dog, LLC, Kristyn Echterling-Savage, and Sean Savage filed a motion for summary judgment and a Local Rule 56(a)(1) statement. Pls.' Mot. for Summ. J., ECF No. 180; Pls.' L.R. 56(a)1 Stmt., ECF No. 181.

On the same day, Beyond the Dog, LLC, Kristyn Echterling-Savage, and Sean Savage also filed a memorandum in support of that motion. Pls.' Mem. in Supp., ECF No. 180-1.

On October 24, 2025, Allyson Salzer and Canine Behavioral Blueprints, LLC filed their memorandum in opposition to the Plaintiffs' motion and a cross-motion under Rule 56(f)(1) for summary judgment. Defs.' Opp'n & Cross-Mot., ECF No. 223.

On October 25, 2025, Allyson Salzer and Canine Behavioral Blueprints, LLC filed their Local Rule 56(a)(2) materials. Defs.' L.R. 56(a)(2) Stmt., ECF No. 224.

On December 5, 2025, Allyson Salzer and Canine Behavioral Blueprints, LLC filed a supplemental brief in support of their motion for summary judgment. Defs.' Suppl. Br., ECF No. 260.

On December 22, 2025, Beyond the Dog, LLC filed its reply in support of its motion for summary judgment and its opposition to the Defendants' cross-motion. Pls.' Reply, ECF No. 266. On the same day, Beyond the Dog, LLC filed supplemental Local Rule 56 materials. Pls.' Suppl. L.R. 56(a)(1) Stmt., ECF Nos. 267, 268.

On January 16, 2026, Allyson Salzer and Canine Behavioral Blueprints, LLC filed their reply in further support of summary judgment. Defs.' Reply, ECF No. 272.

On February 4, 2026, the Court granted Beyond the Dog, LLC leave to file a supplemental opposition to the Defendants' supplemental summary judgment brief. Order, ECF No. 278.

On February 23, 2026, Beyond the Dog, LLC filed its supplemental opposition and corresponding supplemental statement of material facts. Pl.'s Suppl. Opp'n, ECF No. 284; Pl.'s Suppl. L.R. 56(a)2 Stmt., ECF No. 285.

### III. STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").

The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated

speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

### A. Defendants' Motion for Summary Judgment

####     1.    The Misappropriation of Trade Secrets Claims

Under both the Defend Trade Secrets Act ("DTSA")[1] and the Missouri Uniform Trade

Secrets Act ("MUTSA")[2] claims, a plaintiff must prove that it owns a protectable trade secret and

that another party misappropriated it. *Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422

S.W.3d 312, 320 (Mo. 2014) (stating that a MUTSA plaintiff must show "(1) a protectable trade

secret exists, (2) the defendant misappropriated the trade secret; and (3) the plaintiff is entitled to

damages or injunctive relief"); *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948,

955–56 (8th Cir. 2023) (stating that "[t]o demonstrate misappropriation of trade secrets, [Ahern]

must show, among other things, the existence of a protectable trade secret and misappropriation

of that trade secret").

To qualify as a trade secret, the alleged information "must meet two conditions: first, that

'its owner has taken reasonable measures to keep it secret,' and second, that 'it derives

independent economic value from not being known or easily ascertainable by another person

who can obtain economic value from it" *MWG Enters., LLC v. ETS Wound Care, LLC*, 586 F.

---

[1] The DTSA is the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836–1839, which creates a federal private cause of action for trade secret misappropriation. *See* 18 U.S.C. § 1836(b)(1) (providing that "[a]n owner of a trade secret that is misappropriated may bring a civil action" if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce); Pl.'s Suppl. Opp'n at 4, ECF No. 284 (arguing that Plaintiff's "trade secret claims under the DTSA and MUTSA" are governed by "18 U.S.C. § 1839(3), (5)" and "Mo. Rev. Stat. § 417.453(4), (2)").

[2] MUTSA is the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450–.467, which governs the Plaintiff's state-law trade secret claim. *See Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014) (stating that "[a] claim for misappropriation of trade secrets under the MUTSA has three elements: (1) a trade secret exists, (2) the defendant misappropriated the trade secret, and (3) the plaintiff is entitled to either damages or injunctive relief"); Pl.'s Suppl. Opp'n at 4, ECF No. 284 (arguing that the Plaintiff's "trade secret claims under the DTSA and MUTSA" are governed by "18 U.S.C. § 1839(3), (5)" and "Mo. Rev. Stat. § 417.453(4), (2)"); Defs.' Local Rule 56(a)2 Stmt. ¶ 7, ECF No. 224 (admitting that "[t]he Employment Agreement Dr. Salzer signed with BTD upon hire is governed by Missouri law").

Supp. 3d 946, 965 (E.D. Mo. 2022); *Towne Air Freight, LLC v. Double M Carriers, Inc.*, No. 4:14-cv-00567, 2014 WL 2573315, at \*3 (E.D. Mo. June 9, 2014) (stating that MUTSA defines a trade secret as "a formula, pattern, compilation, program, device, method, technique, or process" and that, "[t]o be considered a trade secret, the information must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy"). The owner need only undertake reasonable efforts to preserve secrecy, and "absolute secrecy is not required." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) (stating that "[r]easonable efforts need not be overly extravagant, and absolute secrecy is not required").

Dr. Salzer and Canine Behavioral Blueprints argue that summary judgment should enter because Beyond the Dog "still cannot answer the most basic question in a trade-secret lawsuit: what, precisely, is the secret?" Defs.' Mem. at 8, ECF No. 151-1. They argue that Beyond the Dog "never disclosed the one trade secret they are still pursuing in this case," namely "a 'confidential scoring matrix, the category roll-up/conditional rules [or] the risk thresholds,'" and that "no confidential algorithm or scoring matrix was ever disclosed in this case." Defs.' Suppl. Br. at 2–3, ECF No. 260.

They also argue that the alleged trade secret, the questionnaire, was public, that Dr. Savage authorized dissertation use of the Behavior Evaluation Questionnaire and its "results," and that the retained materials were not used post-employment. Defs.' Reply at 3–4, ECF No. 183 (stating that "the back end was publicly available on KU's website for years" and that "it is still publicly available on other websites . . . including on PACER"); Defs.' Suppl. Br. in Supp. of Mot. for Summ. J. at 4–5, ECF No. 260 (stating that "Appendix D is still publicly available on the Court's docket," that "Appendix D is a modified version of Plaintiffs' questionnaire that Dr. Savage asked Ms. Crosby to prepare specifically for Dr. Salzer's research," and that "Dr. Salzer

11

does not use any scoring matrix in her work"); Defs.' Reply at 9, ECF No. 183 (stating that "Dr. Salzer did not access or use any BTD files after she left BTD.").

In response, Beyond the Dog argues that "The questionnaire prompts and client answers are not trade secrets; the scoring process is." Pl.'s L.R. 56(a)(2) Stmt. at 7, ECF No. 173. Beyond the Dog further argues  that the "trade-secret components include: (a) per-answer scores/weights in the scoring matrix; (b) category roll-up and conditional rules; (c) risk stratification thresholds; and (d) the structure/content of the Results Report." *Id.* at 22–23. Beyond the Dog adds that its trade secret "consists of an integrated intake-to-scoring-to-deployment system that includes non-public scoring logic, categorical aggregation, defined thresholds, weighting values, and a structured reporting output mapped to BTD's training protocols," that it "does not claim that the client-facing intake questions themselves as trade secrets," and that the July 2025 production included "scoring-matrix materials," "internal scoring-to-protocol flowcharts," "multiple versions of BTD's Training Protocols Manual," and BTD's internal "'Case Record' Protocols." Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶¶ 42, 45, 47, 49–52, ECF No. 285.

The Court disagrees.

To "survive summary judgment" Beyond the Dog "must describe [trade] secrets with greater precision: vague and indefinite illustrations will not suffice." *Next Communications, Inc. v. Viber Media, Inc.*, No. 14-cv-8190 (RJS), 2017 WL 4402540, at *4 (S.D.N.Y. September 30, 2017), *aff'd.*, 758 Fed.Appx. 46 (2d Cir. 2018)(citation and internal quotation marks omitted); *see* 758 Fed.Appx. at 49 ("[I]n the context of a trade secret misappropriation claim, the party opposing summary judgment must be able to identify the alleged trade secret with sufficient specificity to make the moving party aware of what information it has allegedly misappropriated.").

Here, the record evidence suggests that parts of any alleged trade secret were already public. For example, Michelle Crosby testified that "clients -- it's publicly available to clients," that "[t]he questions were certainly not confidential," that "[w]e didn't mark any of the items as confidential," and that "I was never told that access was to be limited". Ex. 5, Crosby Depo., ECF No. 260-3, at 10 (stating that "clients -- it's publicly available to clients," that "[t]he questions were certainly not confidential," that "[w]e didn't mark any of the items as confidential," and that "I was never told that access was to be limited").

She also testified that "all of the trainers would have had access to the scoring in the back end." *Id.* (stating that "all of the trainers would have had access to the scoring in the back end"). The public dissertation likewise includes Appendix D marked "DISSERTATION COPY" and displays scored fields such as "Dog Score = 1." Ex. 14, ECF No. 173-14, App'x D. The Animal Use Statement also states that the study would "validate a rapid and easy-to-administer Behavior Evaluation Questionnaire" and "compare the results of the questionnaire with gold standard, lengthier, and potentially riskier assessment methods, known as functional analysis." Ex. I, at 5, ECF No. 152-10.

Ms. Crosby testified that Dr. Savage asked her "to create a copy of the behavioral evaluation questionnaire to assist Dr. Salzer with her dissertation," and that Dr. Savage was aware Dr. Salzer was obtaining "the scoring that she was looking for, the updated scoring we had applied." Ex. 5, Crosby Depo., ECF No. 260-3, at 6, 12.

Beyond the Dog, while arguing that it no longer seeks protection for the client-facing intake questions themselves, Pl.'s L.R. 56(a)(2) Stmt. at 7, ECF No. 173 (stating that "The questionnaire prompts and client answers are not trade secrets; the scoring process is."), now identifies "the trade-secret components" as "(a) per-answer scores/weights in the scoring matrix;

(b) category roll-up and conditional rules; (c) risk stratification thresholds; and (d) the structure/content of the Results Report." *Id.* at 22–23. In Beyond the Dog's view, these components are tied to "non-public scoring logic," "categorical aggregation," "defined thresholds," "weighting values," and "a structured reporting output mapped to BTD's training protocols." Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶ 42, ECF No. 285.

And again in Beyond the Dog's view, its trade secret "applies a non-public scoring logic and a scoring matrix to intake data to generate an internal Proprietary Report" and that the "Proprietary Report includes protocol-linked fields that map the report's scores and outputs to specific training protocols reflected in BTD's Training Protocols Manual and 'Case Records.'" *Id.* ¶¶ 43–44. In addition, Beyond the Dog has offered evidence of arguably reasonable secrecy measures. *See* Pl.'s Suppl. Opp'n at 8, ECF No. 284; Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶¶ 67, 72–73, ECF No. 285 (stating that Beyond the Dog "used password protection and written confidentiality and non-retention agreements," that it "required its employees to sign NDAs," and that it "did not provide clients the Training Protocols Manual, internal scoring matrix values, weighting rules, scoring templates, internal flags, protocol mappings, or the structured content of its proprietary reports").

Beyond the Dog further points to the Guidebook, which arguably makes confidential "[a]ll training materials and case records received during your employment," and instructs employees: "Use confidential information for your personal benefit or profit," "Disclose confidential information to anyone outside of our company," and "Replicate confidential documents and files and store them on insecure devices." Ex. 11, ECF No. 173-11, at 12. The 2020 Employee Manual similarly states that "[t]rainers shall not reveal information in Company records to unauthorized persons," "[t]rainers shall not publish or broadcast material in which the

Company is identified or trainer's connection with the Company is expressed or implied without first submitting such materials to the appropriate Company officials for review and approval," and "[n]o trainer shall be in unauthorized possession of any property of the Company." Ex. W, ECF No. 152-24, at 9–10.

As to anything arguably already publicly available, Beyond the Dog argues that "BTD never authorized attaching or publicly posting the questionnaire or any portion of the scoring matrix in the dissertation," that "[t]he Animal Use Statement permitted only a comparison of results to functional analysis and did not authorize attachment or public posting of back-end materials," and that "[t]he poster presentation did not disclose BTD's back-end scoring algorithm." Pl.'s L.R. 56(a)(2) Stmt. at 23–24, ECF No. 173.[3]

Even more pointedly, Beyond the Dog claims as significant the July 2025 discovery disclosure by the Defendants: "On July 10, 2025 Defendants produced 11,111 pages of documents," that "[t]he July 2025 production was made from Dr. Salzer's Dropbox account," and that the production "included multiple versions of BTD's Training Protocols Manual" and "included BTD's internal 'Case Record' Protocols." Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶¶ 49–52, ECF No. 285 The Defendants' production index itself lists files such as "Training Protocols Manual_02032021.pdf," "Training Protocols Manual for Trainers (11.4.22) (1).pdf," "Training Protocols Manual (9.22) for Trainers.pdf," and "BTD Employee Manual by Michelle Crosby - Flipsnack.html." Ex. Y, ECF No. 152-26, at 13–14.

---

[3] Indeed, to buttress this point, Beyond the Dog also points to Ms. Crosby's own uncertainty. Ms. Crosby testified, "I don't recall" when asked whether Dr. Salzer said she needed "the back end scoring" and whether Crosby had a conversation where she "volunteered to give her the back end scoring matrix." Ex. 5, Crosby Depo., ECF No. 260-3, at 7.

The native file metadata reflected a "Last Print" date of November 5, 2022 for "Training Protocols Manual WORD.docx" and a "Created" date of October 27, 2022 for "Employee Manual-7.pdf." Ex. 14, Kress Decl., ECF No. 285-19, ¶¶ 7, 11. And according to Beyond the Dog's expert, Mr. Harrington, "[t]he defendants have avoided developmental and design costs in the range of $380,000 to $700,000 through the unauthorized use of Beyond The Dog, LLC's confidential and proprietary information." Ex. 41, ECF No. 181-5/Ex. 41, at 7. He also states that "avoided development and design costs realized by the Defendants through the unauthorized use of BTD's confidential and proprietary information is in the range of $288,000 to $576,000." *Id.* at 14.

But none of this record evidence or anything else in the record evidence explains sufficiently what Beyond the Dog's trade secret is, or more specifically, how its "unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Next Communications, Inc.*, 2017 WL 4402540, at *5 (quoting *Integrated Cash Mgmt. Serv., Inc. v. Dig Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)). Phrases, such as "scoring matrix," "non-public scoring logic," "categorical aggregation," "defined thresholds," "weighting values," and "a structured reporting output mapped to BTD's training protocols," are nothing more than vague and generic descriptions, which "do[ ] not reveal . . . what elements of that process (if any) are secret or proprietary, or how those elements in 'unique combination, afford[ ] a competitive advantage." *Id.* (quoting *Integrated Cash Mgmt. Serv., Inc.*, 920 F.2d at 174); *see also Big Vision Private Ltd. V. E.I. Dupont De Nemours & Co.*, 1 F.Supp.3d 224, 258 (S.D.N.Y. 2014)("If a particular piece of information, or a formula, is not entitled to trade secret protection because it is so vague and indefinite, at the time it is divulged, then it

16

cannot be granted protection as a trade secret by a court during litigation if it is vague and indefinite.")(citation and internal quotation marks omitted).

Beyond the Dog cannot satisfy its obligation to provide specificity as to its trade secret by simply identifying a document production by the Defendants, and saying its trade secrets are in there: "the law requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique." *Id.* (citation and internal quotation marks omitted); *see Robinson*, 781 F.3d at 44 ("[T]he opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact . . . . and may not rely on conclusory allegations or unsubstantiated speculation.") (citation and internal quotation marks omitted); *cf. Broad-Ocean Technologies, LLC v. Lei*, 649 F.Supp.3d 584, 592 (E.D. Mich. 2023)(finding it "inadequate for [Plaintiff] merely to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information . . . .")(citations and internal quotation marks omitted); *Big Vision Private Ltd.*, 1 F.Supp.3d at 263 ("[W]hen pressed on the meaning of vague terms like "minimal," "predominantly," and "expensive," Plaintiff refers back to the Rum Reports and Trial Plans . . . . [T]hose documents are hardly illuminating."); *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 968 2d Cir. 1997)("The fact that Fiondella told Darsee that his code contained four design elements does not disclose the manner of their combination.").

Yet, beyond offering the vague and generic descriptions above, and pointing to documents claimed to be its trade secrets, Beyond the Dog has done nothing to allow this Court, much less a factfinder, to "assess" its "protectability" and "show that its compilation is unique." Indeed, if the matter was to go to trial on this claim, it is not clear at all – after this lawsuit's filing, after a preliminary injunction hearing, and after the close of discovery – what precisely a

jury would be asked to protect, and how that jury would know if it had protected it, much less how the Defendants would prepare for such a trial. *See Big Vision Private Ltd.*, 1 F.Supp.3d at 258 ("[S]pecificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation, and can divine the line between secret and nonsecret information, and so that a jury can render a verdict based on a discriminating analysis for the evidence of disclosure and misappropriation."); *id.* at 263 ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition.")(citation and internal quotation marks omitted).

Significantly, this is not the first time that, rather than provide specificity, Beyond the Dog has chosen to be opaque, at best, and evasive, at worst, as to critical issues regarding what is or is not its trade secret. *See* PI Ruling at 14 ("THE COURT: It is a yes or no. He asked you a question. Did you give her permission to use the questionnaire for part of her dissertation? THE WITNESS: The front end. THE COURT: The front end. Did you give [her] permission to use part of the content? THE WITNESS: Yes.")(quoting the testimony of Dr. Kristyn Echterling-Savage); *cf. Next Communications*, 2017 WL 4402540, at *6 ("Next offers no reason why that game should continue – only more evasion and obfuscation. Thus, [Defendant] is entitled to summary judgment on [Plaintiff's] trade-secret misappropriation claim.").

As a result, because the first essential element of Beyond the Dog's trade secret claims under both the DTSA and MUTSA is that a "protectable trade secret exists," *Cent. Tr. & Inv. Co.*, 422 S.W.3d at 320 (identifying as the first element of a MUTSA clam that a plaintiff must show that "a protectable trade secret exists." Beyond the Dog has failed to provide the specificity necessary to assess its trade secret, including but not limited to clarifying what is unique about its

alleged trade secret, there are no genuine issues of material fact to be tried as to these claims. *See Big Vision Private Ltd.*, 1 F.Supp.3d at 271 ("Having failed to describe even the components of its claimed trade secret with particularity, Plaintiff has similarly failed to assert a unified process, desig, and operation; as such, its trade secret claim must fail.")(citing *Sit-Up Lt.d v. IAC/InterActiveCorp.,*No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *9 (S.D.N.Y. Feb. 20, 2008)("Plaintiff has not demonstrated the way in which [the] various components fit together as building blocks in order to form the unique whole, and thus has not raised a triable issue of fact as to its unique combination. Therefore, defendants' motion for summary judgment on this claim is granted.")(citation and internal quotation marks omitted).

Accordingly, the summary judgment motion to dismiss Beyond the Dog's DTSA and MUTSA claims will be granted.

### 2. The Breach of Contract Claims

Under Missouri law, a breach of contract claim requires "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance; (3) breach; and (4) damages." *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. Ct. App. 2017) (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010)). Missouri law also permits covenants protecting "confidential or trade secret business information." Mo. Rev. Stat. § 431.202.1(3)(a). And "[n]ominal damages are available where a contract and its breach are established." *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 669 (Mo. banc 1999) (stating that "[n]ominal damages are available where a contract and its breach are established."); *Shirley's Realty, Inc. v. Hunt*, 160 S.W.3d 804, 808 (Mo. Ct. App. W.D. 2005) (stating that "[t]hat the [party] may be unable to prove actual damages, however, does not constitute a negation of the element of damages on their breach of contract claim.").

Missouri law, however, does not stop at the contract's language when a party seeks to enforce a post-employment restraint. Missouri courts have held that covenants not to compete "are presumptively void and are enforceable only to the extent that they are demonstratively reasonable," that "[t]he enforcing party must also show that the agreement is reasonable in scope, both as to place and as to time," and that "[t]he burden of demonstrating the covenant's validity is on the party seeking to enforce it." *Armstrong v. Cape Girardeau Physician Assocs.*, 49 S.W.3d 821, 825 (Mo. Ct. App. E.D. 2001). *A.B. Chance Co. v. Schmidt*, 719 S.W.2d 854, 858 (Mo. Ct. App. W.D. 1986) (stating that "[a] restrictive covenant on the employee's right to compete must be reasonable as necessary to protect the employer's legitimate interest, and reasonable as to time and geographic scope," and that "[s]uch assessment must be made in consideration of the surrounding circumstances which include the subject matter, the purpose served, the situation of the parties, the limits of the restraint and the specialization of the business venture").

Missouri courts also distinguish between the legal interpretation of a covenant and the factual question whether the covenant, as applied, may be enforced on a particular record. *Armstrong*, 49 S.W.3d at 826 (stating that "[i]n order to determine whether the covenant in this case is too broad it must first be determined whether the restrictions protect narrowly defined and well-recognized interests," that "[t]his cannot be done when the factual allegations upon which these conclusions rest are contested," and that "there are clear factual disputes in this case that cannot be resolved by entering judgment on the pleadings"); *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 848 (Mo. Ct. App. E.D. 2012) (stating that, "[a]s an enforceable covenant against Mr. Kennebrew, a genuine factual issue exists as to whether Mr. Kennebrew's actions violated the covenant," that "[r]esolution of this factual issue is necessary to determine if a violation of

20

the non-compete agreement occurred," and that "[e]ntry of summary judgment on this ground, therefore, is improper").

At the same time, Missouri courts will not enforce an overbroad restraint untethered to a legitimate interest. *Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767, 773 (Mo. Ct. App. E.D. 2014) (stating that "the lack of a geographic limitation here renders the non-compete provision unenforceable without accompaniment by any specificity of limitation on the class with whom contact is limited," and that the agreement there "is an unlawful restraint on Defendant's right to compete"). Missouri courts likewise recognize protection for genuine trade-secret and confidential information imparted in a confidential relationship. *A.B. Chance*, 719 S.W.2d at 859 (stating that "Missouri courts will grant equitable protection for an employer's interest in trade secrets" and that "[w]hether or not an agreement existed, the manufacturer Chance had a common law right in the trade secrets imparted to the employee during a confidential relationship, and for which an injunction may issue").

Dr. Salzer and Canine Behavioral Blueprints argue that "there is no triable evidence of (i) damages or (ii) breach of either the Agreement's non-disclosure or non-compete provisions." Defs.' Mem. at 26, ECF No. 151-1. They further argue that Dr. Salzer "has at all times operated exclusively in Connecticut, well outside the covenant's territorial reach," that "[w]ith no conduct in the proscribed geography during the two-year window, there is no breach," and that "Plaintiff gave express written permission for the only specific item Plaintiff has identified as a purported trade secret . . . to be used in Dr. Salzer's dissertation." *Id.* at 27–29.

They also argue that "the only operative agreement in this case is the 2018 Trainer Non-Compete," that the Agreement "allowed the removal of files from BTD premises if done 'in furtherance of Trainer's duties,'" and that Beyond the Dog "cannot add an entirely new contract

to its claims for the first time in opposition to a summary judgment motion." Defs.' Reply at 5–6, ECF No. 183.

In response, Beyond the Dog argues that the record reflects "retention of thousands of BTD files" and "unauthorized disclosure/use of BTD's scoring matrix in her dissertation." Pl.'s Opp'n at 14, ECF No. 172. Beyond the Dog also argues that "[s]ections 1.C and 1.E bar using or disclosing 'Confidential Information,'" that Dr. Salzer's "continued possession of 'thousands' of BTD documents . . . is a standalone breach," and that "Missouri law deems the damages element satisfied by nominal damages once breach is established, defeating summary judgment even if the precise amount is disputed." *Id.* at 11, 13. Beyond the Dog further argues that the Agreement's text does not support reading the two-year limitation in §§ 1(A) through 1(C) to apply to §§ 1(E) and 1(F).[4]

The Court agrees in part.

Under Missouri law, a court must enforce a contract as written and according to the plain meaning of the words in the contract when the contract is clear and unambiguous." *Dubinsky v. Mermart,* 595 F.3d 812, 816 (8th Cir. 2010)(citations and internal quotation marks omitted). "When faced with conflicting or ambiguous specific and general provisions in a contract, a court should enforce the more specific of the terms." *Id.* (citations omitted). And "[t]he terms of a contract should be read as a whole to determine the intent of the parties, and the test for ambiguity is whether the disputed language is reasonably susceptible of more than one meaning when the words are given their plain meaning as understood by an average person." *Id.* (citations and internal quotation marks omitted).

---

[4] The Court addresses that issue separately below, in connection with the declaratory judgment counterclaims.

The plain, clear, and unambiguous language of Sections 1(A), 1(B) and 1(C) of the Agreement apply for the two-year period following Dr. Salzer's leaving the employ of Beyond the Dog. Ex. B, ECF No. 181-2, at 2–3 (stating "for a period of 2 years after Trainer ceases to have an agreement by Beyond the Dog," "for a period of 2 years thereafter," and "for 2 years"). The Agreement also provides that "[c]onstruction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the State of Missouri." *Id.* at 4.

Given that Missouri law requires these types of restrictive covenants to be "reasonable in scope, both as to place and as to time," and "[t]he burden of demonstrating the covenant's validity is on the party seeking to enforce it," *Armstrong v. Cape Girardeau Physician Assocs.*, 49 S.W.3d 821, 825 (Mo. Ct. App. E.D. 2001), and because, under Missouri law, courts are urged to "reject the interpretation of a contract that leads to 'unreasonable results when probable or reasonable construction can be adopted'," *Dubinsky*, 595 F.3d at 818 (quoting *Stonebrook Estates, LLC v. Greene County*, 275 S.W.2d 353, 355 (Mo.Ct.App.2008)), Sections 1(E) and 1(F) of this Agreement, consistent with the other express provisions in the Agreement, shall be construed as having a term of no more than two years following Dr. Salzer leaving the employment of Beyond the Dog.

But the contract's language does not, however, resolve the scope of these provisions as a matter of law. Missouri's reasonableness standard requires a court to construe the agreement's language, while still leaving for trial whether the restraint, as applied, protects a legitimate interest and whether the challenged conduct actually violated the covenant. *Armstrong*, 49 S.W.3d at 825–26 (stating that courts may not determine overbreadth "as a matter of law" where "it must first be determined whether the restrictions protect narrowly defined and well-recognized interests" and "[t]his cannot be done when the factual allegations upon which these

conclusions rest are contested"); *Whelan*, 379 S.W.3d at 848 (stating that "[a]s an enforceable covenant against Mr. Kennebrew, a genuine factual issue exists as to whether Mr. Kennebrew's actions violated the covenant" and that "[t]here remain genuine issues of fact that must be resolved by the trier of fact").

Section 1(E) is directed to removing and using Beyond the Dog materials and information[5], and § 1(F) narrows the agreement by exempting "[a]ctivities solely for academic purposes and not-for-profit." Ex. B, ECF No. 181-2, at 3. Missouri law thus requires not only interpretation of these provisions, but also an application of the "reasonableness]" inquiry to the "surrounding circumstances." *A.B. Chance*, 719 S.W.2d at 858 (stating that "[a] restrictive covenant on the employee's right to compete must be reasonable as necessary to protect the employer's legitimate interest, and reasonable as to time and geographic scope," and that "[s]uch assessment must be made in consideration of the surrounding circumstances which include the subject matter, the purpose served, the situation of the parties, the limits of the restraint and the specialization of the business venture").

While Beyond the Dog no longer has viable trade secret claims under both DTSA and MUTSA, as discussed above, there remains an issue as to whether any "Confidential Information" under the Agreement can still provide a basis for Beyond the Dog's breach of contract claim, which is now limited to the two-year period ending on March 23, 2025. As a matter of law, consistent with the Agreement's plain terms, "[a]ctivities solely for academic purposes and not-for-profit will be made exempt from the Agreement." Ex. B, ECF No. 181-2, at 3; *see Dubinsky,* 595 F.3d at 816 (requiring a court to "enforce a contract as written and

---

[5] Under Section 1(E), "[a]t no time shall Trainer, directly or indirectly, remove or cause to be removed from the premises of Beyond the Dog or any Subsidiary any memorandum, note, list, record, file, document or other paper, equipment or any like item relating to its business . . . except in furtherance of the performance of Trainer's duties hereunder." Ex. B, ECF No. 181-2, at 3.

according to the plain meaning of the words in the contract when the contract is clear and unambiguous."). The Agreement further makes clear this carveout provision applies to work done by Dr. Salzer in connection with the University of Kansas. *See* Ex. B, ECF No. 181-2, at 4 ("This includes research conducted on basic behavioral processes and being involved in teaching practices at the University of Kansas while the trainer is enrolled. Both parties acknowledge research conducted as a student at the University of Kansas is owned by the university and the trainer does not have the right to give away the research.").

As a result, since any academic or not-for-profit work is "exempt from the Agreement," there can be no viable breach of contract claim arising out of any such work, even if now considered to be "Confidential Information" by Beyond the Dog. Any other reading of this Agreement would lead to 'unreasonable results when probable or reasonable construction [of the Agreement] can be adopted." *Dubinsky*, 595 F.3d at 818 (citation and internal quotation marks omitted)[6]. Thus, as a matter of law, in the absence a genuine issue of fact as to Dr. Salzer's doctoral dissertation being for "academic purpose," anything contained in it, related to it, or retained or used for it cannot be the basis for Beyond the Dog's breach of contract claim.[7] To be clear, the same holds true for any other material related to any other academic or non-profit endeavors. To the extent that Dr. Salzer retained any of the "Confidential Information" under the

---

[6] Beyond the Dog argues that "[t]he AUS does not grant blanket approval to publish, attach or publicly disclose BTD's scoring matrix or any part of BTD's proprietary materials," that "[a]uthorization was limited to experimental comparison," and that "[n]othing in Exhibit I indicates the BTD provided permission to Dr. Salzer to attach and publicly disclose BTD's scoring algorithm into her thesis." Pl.'s L.R. 56(a)(2) Stmt. ¶ 28, ECF No. 173. This argument, however, ignores the plain language of the Agreement, which "exempt" from it "[a]ctivities solely for academic purposes," Ex. B, ECF No. 181-2, at 3, and consistent with the caselaw above, this Court must enforce.

[7] Significantly, in addition to Section 1(F)'s academic carveout language, there is record evidence of an Animal Use Statement authorizing Dr. Salzer to "validate a rapid and easy-to-administer Behavior Evaluation Questionnaire" and "compare the results of the questionnaire with gold standard, lengthier, and potentially riskier assessment methods, known as functional analysis." Ex. I, ECF No. 152-10, quoted in Pl.'s L.R. 56(a)(2) Stmt. ¶ 28, ECF No. 173 (quoting the Animal Use Statement).

Employment Agreement for any academic purpose or for non-profit work (either on behalf of such an entity or for use by any such entity), any such use is a complete defense to Beyond the Dog's breach of contract claim and no liability can result from such use because any such use is "exempt from the Agreement." Ex. B, ECF No. 181-2, at 4

As to any remaining breach of contract claim related to "Confidential Information, that claim too is fairly limited. Indeed, for the reasons similar to why Beyond the Dog has no viable trade secret claim, it similarly has a very limited breach of contract claim related to the same information: the lack of specificity as to what precisely is "Confidential Information." *See Robinson*, 781 F.3d at 44 ("[T]he opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact . . . . and may not rely on conclusory allegations or unsubstantiated speculation.") (citation and internal quotation marks omitted).

With one exception, material identified in the July 2025 production (noted above), Beyond the Dog's breach of contract claim, as it relates to "Confidential Information," lacks sufficient specificity, to the extent it is not already limited by the two-year time frame and the exclusions discussed above under Section 1(F) of the Agreement. Here, as to these specific set of documents, there is a genuine issue of material fact, one a jury must decide applying Missouri's reasonableness standard.

For their part, the Defendants argue that any such retention was permitted under "except in furtherance" language, were files she "accumulated during her tenure at BTD" and "has not [been] disclosed/used the information since leaving BTD, a fact corroborated by the metadata." Defs.' Reply at 5–6, ECF No. 183; Ex. X, ECF No. 152-25, at 4.

26

Beyond the Dog, by contrast, argues that "[h]er obligation was, and remains, to return or destroy all confidential information in her possession upon departure," that "any and all confidential information obtained or created during the course of her employment that is not otherwise lawfully accessible to the general public must be returned or destroyed," and that "[t]his includes all BTD-related business materials, irrespective of format or origin." Ex. X, ECF No. 152-25, at 2–3.

On this record, that dispute is for the trier of fact to resolve, not this Court on a motion for summary judgment. *Whelan*, 379 S.W.3d at 848 (stating that "[t]here remain genuine issues of fact that must be resolved by the trier of fact"). Similarly, the issue of damages will require resolution by a jury, although its scope may be subject to further limitation by motions *in limine* before trial, given that this Ruling and Order has now modified the scope of Beyond the Dog's breach of contract claim. In any event, Missouri law recognizes that "[n]ominal damages are available where a contract and its breach are established." *Dierkes*, 991 S.W.2d at 669. Thus, the issue of damages alone would not have precluded a trial, as long as there is sufficient factual basis for any alleged breach.

Accordingly, the Defendants' motion for summary judgment is denied as to Beyond the Dog's breach-of-contract claim, and Plaintiffs' motion for summary judgment is denied as to the declaratory judgment counterclaims, as it relates to this breach of contract claim.

But the scope of this breach of contract claim is limited to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Employment Agreement.

### 3. The Unjust Enrichment Claim

27

Under Missouri law, unjust enrichment requires "(1) a benefit conferred upon the defendant by the plaintiff; (2) the defendant's appreciation or recognition of the benefit; and (3) the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Graves v. Berkowitz*, 15 S.W.3d 59, 61–62 (Mo. App. W.D. 2000). Missouri courts also recognize that unjust enrichment "prevents retention of benefits unjustly obtained." *Hertz Corp. v. RAKS Hospitality, Inc.*, 196 S.W.3d 536, 543 (Mo. App. E.D. 2006). And unjust enrichment requires a concrete benefit "actually conferred and unjustly retained." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010).

Dr. Salzer and Canine Behavioral Blueprints argue that the unjust-enrichment claim fails because "[a]n express contract governs the confidentiality and competition issues Plaintiff invokes" and because Beyond the Dog has "no proof of detriment or enrichment." Defs.' Mem. at 30–31, ECF No. 151-1 (stating that "[a]n express contract governs the confidentiality and competition issues Plaintiff invokes" and that Plaintiff has "no proof of detriment or enrichment").

They also argue that the claim is "an improper attempt to expand its contract claim to a non-party," that "statutory remedies occupy the field," and that there is "no evidence of an unjust act or of an improper benefit being conferred." Defs.' Reply at 8, ECF No. 183. They further argue that "Dr. Savage authorized the use of Appendix D in Dr. Salzer's dissertation," that "CBB uses no back-end process at all," and that "Dr. Salzer did not access or use any BTD files after she left BTD." Defs.' Reply at 8, ECF No. 183.

In response, Beyond the Dog argues that unjust enrichment may proceed because "CBB is a non-party" and because "Missouri permits unjust enrichment to be pleaded in the alternative to contract until it is determined whether the contract fully governs the benefits at issue." Pl.'s

Opp'n at 24–25, ECF No. 172. Beyond the Dog also argues that the Defendants obtained concrete benefits by "publicly attaching a portion of BTD's confidential scoring matrix to Salzer's dissertation and using that document for credentialing (CAAB), recommendations, job applications, and business promotion," by "launching and operating an intake-to-report workflow at CBB that mirrors BTD's two-part system," and by "retaining thousands of BTD files post-departure, preserving access to BTD's internal know-how." Id. at 24–25. Beyond the Dog further argues that "[t]hese facts readily allow a restitutionary award measured by Defendants' gain." *Id*. at 25.

In Beyond the Dog's view, "[w]ithin the statutory trade-secret counts, unjust enrichment remains an express measure of recovery," that MUTSA authorizes recovery for "the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss," and that "DTSA likewise permits unjust-enrichment damages." *Id*. at 25–26 (stating that "[w]ithin the statutory trade-secret counts, unjust enrichment remains an express measure of recovery," quoting Mo. Rev. Stat. § 417.457(1) as authorizing recovery for "the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss," and stating that "DTSA likewise permits unjust-enrichment damages.").

The Court disagrees.

On this record, Beyond the Dog's unjust enrichment claim cannot survive as a separate common law count. Even accepting Beyond the Dog's argument that Canine Behavioral Blueprints is not a party to the Agreement and that the claim may be pleaded in the alternative, the concrete benefits Beyond the Dog identifies are the same alleged benefits underlying its contract and trade-secret theories: "publicly attaching a portion of BTD's confidential scoring matrix to Salzer's dissertation," "launching and operating an intake-to-report workflow at CBB,"

and "retaining thousands of BTD files post-departure." Pl.'s Opp'n at 24–25, ECF No. 172 (stating that "CBB is a non-party" and that "Missouri permits unjust enrichment to be pleaded in the alternative to contract until it is determined whether the contract fully governs the benefits at issue," and identifying the alleged benefits as "publicly attaching a portion of BTD's confidential scoring matrix to Salzer's dissertation," "launching and operating an intake-to-report workflow at CBB," and "retaining thousands of BTD files post-departure, preserving access to BTD's internal know-how.").

Beyond the Dog's own damages materials frame the same theory the same way. And the record evidence submitted by Beyond the Dog likewise tie the same alleged benefits to the same retained files theory, stating that "[o]n July 10, 2025 Defendants produced 11,111 pages of documents," that "[t]he July 2025 production was made from Dr. Salzer's Dropbox account," and that the production "included multiple versions of BTD's Training Protocols Manual" and "included BTD's internal 'Case Record' Protocols." Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶¶ 49–52, ECF No. 285.

That overlap matters. Beyond the Dog itself says that "[w]ithin the statutory trade-secret counts, unjust enrichment remains an express measure of recovery," and that "DTSA likewise permits unjust-enrichment damages." Pl.'s Opp'n at 25–26, ECF No. 172 (stating that "[w]ithin the statutory trade-secret counts, unjust enrichment remains an express measure of recovery" and that "DTSA likewise permits unjust-enrichment damages."). The Defendants, in turn, argue that the separate unjust-enrichment count is "an improper attempt to expand its contract claim to a non-party" and that "statutory remedies occupy the field." Defs.' Reply at 8, ECF No. 183 (stating that the claim is "an improper attempt to expand its contract claim to a non-party" and that "statutory remedies occupy the field").

Missouri law supports that conclusion where the alternative unjust enrichment theory rests on the same harm as the contract theory. *CoMo Premium Construction LLC v. Pulster*, 724 S.W.3d 823, 829 (Mo. App. W.D. 2025) (holding that, where breach-of-contract, quantum-meruit, and unjust-enrichment claims were "all based on one harm," a finding on the contract claim "implicitly denied the other two claims" because that finding "necessarily means the trial court found a contract existed, which is antithetical to the quantum-meruit and unjust-enrichment claims that were pled in the alternative," and explaining that the plaintiff "could not recover both for breach of contract and quantum meruit or unjust enrichment").

On this record, the common-law count adds no materially distinct theory of recovery beyond the same alleged retention, use, and competitive benefit already included in Beyond the Dog's contract and statutory trade-secret theories. *Howard*, 316 S.W.3d at 436 (stating that unjust enrichment demands a concrete benefit "actually conferred and unjustly retained."); *Hertz*, 196 S.W.3d at 543 (stating that unjust enrichment "prevents retention of benefits unjustly obtained.").

Accordingly, the Court will grant summary judgment as to Beyond the Dog's unjust-enrichment claim.

### 3.  The Unfair Competition Claims

Under Missouri law, an unfair-competition claim is focused on "passing off or attempting to pass off the business or services of one as the business or services of another." *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3d 62, 64 (Mo. Ct. App. 2012) (stating that Missouri unfair competition concerns "passing off or attempting to pass off the business or services of one as the business or services of another"); Defs.' Mem. at 31–32, ECF No. 151-1 (arguing that Missouri common-law unfair competition requires "classic passing off"); Defs.' Reply at 9–10, ECF No. 183 (stating that Beyond the Dog cannot show Defendants used "BTD's name, logo, or get-up").

Missouri law also states that "[n]othing less than conduct tending to pass off one man's goods or business as that of another will constitute unfair competition." *Westminster Laundry Co. v. Hesse Envelope Co.*, 174 Mo. App. 238, 242, 156 S.W. 767, 768 (1913) (stating that "[n]othing less than conduct tending to pass off one man's goods or business as that of another will constitute unfair competition"). And unfair competition "consists, essentially, in passing off or attempting to pass off, on the public, the goods or business of one person as and for the goods or business of another." *Nat'l Motor Club of Mo., Inc. v. Noe*, 475 S.W.2d 16, 19 (Mo. 1972) (stating that unfair competition "consists, essentially, in passing off or attempting to pass off, on the public, the goods or business of one person as and for the goods or business of another"). "Missouri courts may look to the Restatement (Third) of Unfair Competition when analyzing unfair competition claims." *Am. Equity*, 371 S.W.3d at 64 (stating that "Missouri courts may look to the Restatement (Third) of Unfair Competition when analyzing unfair competition claims."). And "the Restatement provides that a [party] can be subject to liability for harm to another's commercial relations where the party engages in certain deceptive practices," and that "[t]hese practices include, in relevant part, deceptive marketing, infringement of trademarks and other indicia of identification, and appropriation of intangible trade values, such as trade secrets." *See Id.*

"[T]he phrase 'origin of goods' in the Lanham Act refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."[8]*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003)).

---

[8] The Lanham Act, 15 U.S.C. §§ 1051–1141n, and specifically Section 43(a), 15 U.S.C. § 1125(a), governs Beyond the Dog's federal unfair-competition claim. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28–29, 37 (2003) (describing Section 43(a) and explaining that "origin of goods" refers to "the producer of the tangible goods" rather than the author of an "idea, concept, or communication" embodied in them); *Fashion*

The Supreme Court in *Dastar* also warned that "reading § 43(a) of the Lanham Act as creating a cause of action for, in effect, plagiarism" would "create[] a species of mutant copyright law." *Id.* at 34, 36 (stating that "reading § 43(a) of the Lanham Act as creating a cause of action for, in effect, plagiarism" would create "a species of mutant copyright law"). A Lanham Act false-advertising claim also requires "commercial speech," made "for the purpose of influencing consumers to buy defendant's goods or services," and "disseminated sufficiently to the relevant purchasing public." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56–58 (2d Cir. 2002) (stating that "commercial advertising or promotion" must be "commercial speech," made "for the purpose of influencing consumers to buy defendant's goods or services," and "disseminated sufficiently to the relevant purchasing public"); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255–56 (2d Cir. 2014) (stating that "[t]o establish false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the plaintiff must first demonstrate that the statement in the challenged advertisement is false"; that "'[f]alsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers'"; that "the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product"; that "the defendant placed the false or misleading statement in interstate commerce"; and that "the plaintiff has been ... injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products").

Dr. Salzer and Canine Behavioral Blueprints argue that both unfair competition claims fail as a matter of law. They contend that Missouri law is "limited to classic passing-off, which

---

*Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56–58 (2d Cir. 2002) (stating that, to qualify as "commercial advertising or promotion," the challenged representations must be "commercial speech," made "for the purpose of influencing consumers to buy defendant's goods or services," and "disseminated sufficiently to the relevant purchasing public").

involves selling one's goods/services as those of another, i.e., source confusion," that there is "no evidence Defendants used BTD's name, logo, or get-up," and that, after *Dastar*, "'origin of goods' refers to the producer of a tangible product sold-not the author of underlying ideas or methods." Defs.' Reply at 9–10, ECF No. 183 (stating that Missouri common-law unfair competition is "limited to classic passing-off, which involves selling one's goods/services as those of another, i.e., source confusion," and that "[t]here is no evidence Defendants used BTD's name, logo, or get-up"); Defs.' Mem. at 32, ECF No. 151-1 (arguing that, after *Dastar*, "origin of goods" refers to "the producer of a tangible product sold-not the author of underlying ideas or methods"). They also argue that "[a] false-advertising theory requires a commercial advertisement or promotion directed to consumers that is false or misleading, material, and injurious." Defs.' Reply at 9–10, ECF No. 183 (stating that "[a] false-advertising theory requires a commercial advertisement or promotion directed to consumers that is false or misleading, material, and injurious").

In response, Beyond the Dog argues that its Missouri law claim rests on "deceptive marketplace conduct." Pl.'s Opp'n at 28, ECF No. 172 (arguing that "[t]he unfair-competition theory here targets deceptive marketplace conduct non-attribution in credentialing and promotion and a misleading presentation of services built on BTD's method not merely the acquisition/use elements of trade-secret law"). Beyond the Dog also argues that "CBB's intake process mirrors BTD's distinctive two-part system (front-end prompts and non-public back-end scoring that generates a protocol-oriented report), reinforcing a false impression of origin and distinctiveness in the services Defendants sell." Pl.'s Opp'n at 27, ECF No. 172 (stating that "CBB's intake process mirrors BTD's distinctive two-part system (front-end prompts and non-public back-end scoring that generates a protocol-oriented report), reinforcing a false impression of origin and

34

distinctiveness in the services Defendants sell."). As to the Lanham Act, Beyond the Dog argues

that its federal claim concerns "false advertising about services," not "authorship credit in a book

or video." Pl.'s Opp'n at 29, ECF No. 172 (stating that "BTD's federal claim is framed as false

advertising about services not authorship credit in a book or video").

The Court disagrees.

Although Missouri unfair competition primarily focuses on passing off, Missouri courts

also look to the Restatement (Third) of Unfair Competition and consider "deceptive marketing"

and "appropriation of intangible trade values, such as trade secrets." *Am. Equity*, 371 S.W.3d at

64. Beyond the Dog's state-law theory is not limited to a bare allegation of non-attribution, and

also can encompass its trade secret claims.

Indeed, Beyond the Dog points to evidence that Sean Savage "reviewed the website Dr.

Salzer created and noted a number of similarities to the BTD website." Sean Savage Aff. ¶ 12,

ECF No. 181-3 (stating that Sean Savage "reviewed the website Dr. Salzer created and noted a

number of similarities to the BTD website"). Beyond the Dog also points to evidence that Canine

Behavioral Blueprints' public-facing services were tied to a similar intake-to-report structure.

Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶ 96, ECF No. 285 (stating that "Defendants produced CBB

reports that are generated from data collected through an intake questionnaire administered using

the JotForm platform").

The same filing states that "CBB's report categorizes problem behavior in a manner

described as a diagnosis of the problem behavior" and that Dr. Savage testified that "this

diagnostic output is then used to generate a subsequent report used for case planning." Pl.'s

Suppl. L.R. 56(a)(2) Stmt. ¶ 97, ECF No. 285. Beyond the Dog's damages expert likewise

addresses similarities between the assessment questionnaires. Ex. 41 at 10–12, ECF No. 181-5/Ex. 41.

The dissertation itself also states that the "Behavior Evaluation Questionnaire" "was developed by master's and PhD level behavior analysts and researchers at Beyond the Dog, LLC." Ex. 173-14 at 28, ECF No. 173-14.

But as that recounting of the record evidence shows, Beyond the Dog's Missouri unfair competition claim is not at all analytically distinct from Beyond the Dog's now dismissed DTSA and MUTSA claims. As a result, as a matter of law, this claim too must fail. Compare *Cent. Tr. & Inv. Co.*, 422 S.W.3d at 320 (stating that a MUTSA plaintiff must show "(1) a protectable trade secret exists, (2) the defendant misappropriated the trade secret; and (3) the plaintiff is entitled to damages or injunctive relief") with *Am. Equity*, 371 S.W.3d at 64 ("Section 1 of the Restatement [(Third) of Unfair Competition] provides that a party can be subject to liability for harm to another's commercial relations where the party engages in certain deceptive practices. These practices include . . . and appropriation of intangible trade values, such as trade secrets.") (internal quotation mark omitted).

Beyond the Dog's Lanham Act unfair competition claim likewise fails. Beyond the Dog alleges that this federal claim concerns "false advertising about services." Pl.'s Opp'n at 29, ECF No. 172. But on this record, Beyond the Dog still centers this claim on allegations that Canine Behavioral Blueprints "mirrors BTD's distinctive two-part system," that Dr. Salzer's website contained "a number of similarities to the BTD website," and that dissertation and questionnaire materials were used to "demonstrate her professional qualifications." Pl.'s Opp'n at 27, ECF No. 172 (stating that "CBB's intake process mirrors BTD's distinctive two-part system"); Sean Savage Aff. ¶ 12, ECF No. 181-3 (stating that Sean Savage "reviewed the website Dr. Salzer

36

created and noted a number of similarities to the BTD website"); Pl.'s Suppl. L.R. 56(a)(2) Stmt. ¶¶ 94–95, ECF No. 285 (stating that "Dr. Salzer used the scoring matrix and related materials as part of her credentialing process and to demonstrate her professional qualifications" and that she used her dissertation as "work product" to "demonstrate her expertise and qualifications").

The Supreme Court foreclosed this type of non-attribution or methodology-based claim, however, in *Dastar*. *Dastar*, 539 U.S. at 37 (stating that "origin of goods" does not refer to "the author of any idea, concept, or communication embodied in those goods"); *id.* at 36 (stating that reading the statute to reach "plagiarism" would create "a species of mutant copyright law"). And there is no record evidence identifying the sort of  commercial advertisement or promotion directed to consumers that is false or misleading, material, and injurious required for a Lanham Act false-advertising theory. Defs.' Reply at 9–10, ECF No. 183 (stating that "[a] false-advertising theory requires a commercial advertisement or promotion directed to consumers that is false or misleading, material, and injurious"); *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 56–58 (stating that the challenged statement must be "commercial speech," made "for the purpose of influencing consumers to buy defendant's goods or services," and "disseminated sufficiently to the relevant purchasing public"). On this record, Beyond the Dog thus has not created a genuine issue of material fact on a Lanham Act theory distinct from its trade-secret and contract claims.

Accordingly, the summary judgment motion to dismiss Beyond the Dog's Missouri unfair competition claim, and Lanham Act unfair competition claim will be granted.

**B. Plaintiffs' Motion for Summary Judgment on the Counterclaims**

The Court next turns to the motion for summary judgment filed by Beyond the Dog, Dr. Echterling-Savage, and Sean Savage, and addresses whether the Plaintiffs are entitled to

judgment as a matter of law on the counterclaims asserted by Dr. Salzer and Canine Behavioral Blueprints in their Amended Answer, Affirmative Defenses, and Amended Counterclaims, ECF No. 86.

Those counterclaims allege declaratory judgment on the scope of the contract, violations of CUTPA, tortious interference with contractual or business relations, defamation *per se*, common-law unfair competition, and negligent infliction of emotional distress.

The Court addresses each counterclaim in turn.

### 1.    The Declaratory-Judgment Counterclaim

Dr. Salzer and Canine Behavioral Blueprints seek declaratory relief concerning the scope and duration of the parties' obligations under the Employment Agreement. See Am. Answer, Affirmative Defenses, and Am. Countercls. ¶¶ 356–372, ECF No. 86. More specifically, Dr. Salzer and Canine Behavioral Blueprints allege that an "actual controversy has arisen and now exists" concerning the parties' contractual rights and obligations, that the Agreement's non-compete and non-disclosure provisions were "time limited in the contract for two years and expired on March 22, 2025," and that "the parties' contractual relationship for any and all purposes is at an end as of March 23, 2025." *Id*. ¶¶ 358, 361, 369.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that this counterclaim fails as a matter of law because Dr. Salzer's and Canine Behavioral Blueprints' requested declaration "misconstrues the Agreement by grafting the two-year limit in §§ 1(A)–1(C) onto §§ 1(E) and 1(F), contrary to both the contract's text and Missouri interpretive rules." Pls.' Mem. in Supp. at 5–6, ECF No. 180-1.

In response, Dr. Salzer and Canine Behavioral Blueprints argue that their declaratory-judgment claim "can be resolved on summary judgment," that "The Court has already found that

38

Dr. Salzer's non-compete, and non-disclosure obligations have ended," that "Section 1(E) of the Agreement states" that "[t]he foregoing provisions of this Subsection shall apply during and after the period when Trainer is an employee, consultant and/or advisor of the Beyond the Dog . . . ", but that "[t]his more general provision of Section 1(E) does not alter the more specific provision of Section 1(C) that sets a definite term on Dr. Salzer's non-disclosure obligations," and that "[u]nlike Sections 1(C) and 1(E), Section 1(F) is not a non-disclosure obligation at all" but instead "makes 'exempt' from the parties' contractual relationship 'activities solely for academic purposes and not-for-profit.'" Defs.' Opp'n and Cross-Mot. at 10–14, ECF No. 223. Dr. Salzer and Canine Behavioral Blueprints thus seek a declaration that all post-employment obligations expired after two years and that their contractual relationship with Beyond the Dog ended on March 23, 2025. See Am. Answer, Affirmative Defenses, and Am. Countercls. ¶¶ 361–372, ECF No. 86.

The Court agrees in part.

As discussed above, the Court has already concluded that §§ 1(E) and 1(F) are subject to the two-year limitation applicable to §§ 1(A), 1(B), and 1(C), but that genuine disputes of material fact remain as to the reasonableness and application of those provisions, as to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement.

Accordingly, Dr. Echterling-Savage's, and Sean Savage's motion for summary judgment will be granted in part, and denied in part.

Sections 1(E) and 1(F) of the Trainer Non-Compete Agreement are subject to the two-year limitation applicable to §§ 1(A), 1(B), and 1(C), and all post-employment obligations under the Trainer Non-Compete Agreement ended on March 23, 2025.

But there remains a genuine issue of material fact as to the reasonableness and application of those provisions, limited to and only as to whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement.

## 2. The Connecticut Unfair Trade Practices Act[9] Counterclaims

Under the Connecticut Unfair Trade Practices Act ("CUTPA"), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" and providing a private right of action to a person who suffers an "ascertainable loss of money or property, real or personal. " Conn. Gen. Stat. §§ 42-110b(a), 42-110g(a).

"To state a claim under CUTPA, the plaintiff must allege that the actions of the defendant were performed in the conduct of 'trade or commerce' " and that "an employment relationship does not constitute trade or commerce for purposes of CUTPA." ) *Muniz v. Kravis*, 59 Conn. App. 704, 711 (2000) (); *see Connelly v. Hous. Auth.*, 213 Conn. 354, 362 (1990) (stating that "[w]hether the defendant is subject to CUTPA is a question of law, not fact"); *Sempey v. Stamford Hosp.*, 180 Conn. App. 605, 617 (2018) (stating that "an employment relationship does not

---

[9] The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a to 42-110q, and specifically §§ 42-110b(a) and 42-110g(a), governs the state-law unfair-trade-practices claim at issue here. *See* Conn. Gen. Stat. § 42-110b(a) (stating that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"); Conn. Gen. Stat. § 42-110g(a) (requiring an "ascertainable loss of money or property, real or personal" for a private CUTPA claim); *Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 643 (D. Conn. 2003) (stating that "the actual employment relationship is not itself trade or commerce"); *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013) (stating that CUTPA unfairness turns on whether the challenged conduct "offends public policy," is "immoral, unethical, oppressive, or unscrupulous," or "causes substantial injury to consumers, competitors or other businessmen").

implicate trade or commerce as required by CUTPA"); *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013) (stating that CUTPA unfairness turns on whether the challenged conduct "offends public policy," is "immoral, unethical, oppressive, or unscrupulous," or "causes substantial injury to consumers, competitors or other businessmen"); *Marinos v. Poirot*, 308 Conn. 706, 714 (2013) (stating that "[t]he ascertainable loss requirement [of § 42-110g] is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief" and that "to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation"); *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 290 (D. Conn. 2017) (stating that "a plaintiff, in order to establish a viable CUTPA claim, must plead and prove both these elements: first, conduct by the defendant which violates the statute; and second, an ascertainable loss suffered by plaintiff caused by that conduct").

Dr. Salzer and Canine Behavioral Blueprints base their CUTPA theories on, among other things, the MSPCA letter, the Our Companions contacts, statements to Daniel McClutchy, the recommendation-letter dispute, and the alleged undercover inquiry designed to induce Dr. Salzer into an "unethical engagement." Amended Answer, Affirmative Defenses, and Amended Counterclaims, ECF No. 86, at 30–32, 48–49, 56–60.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that these CUTPA claims fail because every challenged act arose from "employment-relationship enforcement, not marketplace conduct," and because the Defendants "show no ascertainable loss flowing from them." Pls.' Mem. in Supp. at 10–11, ECF No. 180-1. They further argue that the December 18, 2023 MSPCA letter "did not accuse Dr. Salzer of any wrongdoing," that it was sent "to ensure

41

non-disclosure, not to interfere with her employment," and that MSPCA "has continued to employ Dr. Salzer and has even given her a raise." *Id*. at 2–3.

As to McClutchy and Our Companions, the Plaintiffs argue that the communications were "a limited, nonpublic 'mystery-shopper' inquiry," "two-email exchanges," and "a public seminar," not marketplace conduct. Pls.' Mem. in Supp. at 17, 21–22, ECF No. 180-1. The Plaintiffs also argue that employment recommendation letters are not subject to CUTPA and that any defamation-based CUTPA theory fails as a matter of law. Pls.' Mem. in Supp. at 23–25, ECF No. 180-1.

In response, Dr. Salzer and Canine Behavioral Blueprints argue that the Plaintiffs' account is incomplete and that, "with the facts viewed in Defendants' favor, Plaintiffs' Summary Judgment Motion must be denied." Defs.' Reply at 8, ECF No. 272. They argue that the Plaintiffs "lied to third parties about their intellectual property and contract rights to accuse Dr. Salzer of stealing trade-secret information and breaching her agreement with BTD," and that the Plaintiffs "unfairly interfered in Dr. Salzer's employment relationships or business." *Id.*

They also further argue that the Plaintiffs' own damages expert "quantifies Defendants' lost profits between $17,044 and $29,885," and that this "establishes sufficient loss under the Connecticut Unfair Trade Practices Act." *Id.* at 9 (stating that Plaintiffs' expert "quantifies Defendants' lost profits between $17,044 and $29,885" and that this "establishes sufficient loss under the Connecticut Unfair Trade Practices Act"). The Defendants argue that the Plaintiffs "repeatedly dangled the promise" of a recommendation letter, falsely told McClutchy that Dr. Salzer "stole" Beyond the Dog's materials, and used an inquiry that "was not an authorized mystery-shopper inquiry" to interfere with Dr. Salzer's business. *See* Am. Answer, Affirmative Defenses, and Am. Countercls., ECF No. 86; Defs.' Reply at 8–9, ECF No. 272.

Dr. Salzer and Canine Behavioral Blueprints further argue that "Contrary to Plaintiffs' characterization, none of Plaintiffs' efforts were 'employment-relationship enforcement' and summary judgment on that basis would be improper," that "None of BTD's acts regarding the MSPCA, Our Companions, or McClutchy were a pre-litigation investigation, are not privileged, and therefore summary judgment on that basis is not appropriate," and that "The University of Kansas Take-Down Notice Was Improper." Defs.' Opp'n and Cross-Mot. at 19, 20, 26, ECF No. 223.

The Court agrees.

The Plaintiffs are correct that not every employment-related dispute falls within CUTPA. *v. Hous. Auth.*, 213 Conn. 354, 362 (1990) (stating that "[w]hether the defendant is subject to CUTPA is a question of law, not fact"); *Muniz*, 59 Conn. App. at 711 (stating that "an employment relationship does not constitute trade or commerce for purposes of CUTPA"); *Sempey*, 180 Conn. App. at 617 (stating that "an employment relationship does not implicate trade or commerce as required by CUTPA").

On this record, however, the Court cannot conclude as a matter of law that these CUTPA claims arise only from the employment relationship and therefore clearly fall outside of CUTPA. The MSPCA letter, for example, did not merely preserve rights in the abstract. It asked MSPCA to take "the necessary steps to ensure that Ms. Salzer remains in compliance," including "[i]mplementing measures to prevent MSPCA from accessing or using confidential information of BTD" and "[t]aking any other necessary actions to ensure that Ms. Salzer does not benefit from any misappropriation of BTD's confidential information or trade secrets." Ex. DD, ECF No. 181-4, at 3. And the July 15, 2025 e-mail concerning MSPCA states that "Dr. Bright implemented measures at the MSPCA based on our application." Ex. L, ECF No. 181-12, at 2.

The Defendants also point out that Dr. Salzer's non-profit work was "specifically excluded from the scope of her Agreement with BTD," that the letter was not sent for "protective, compliance purpose[s]" but to "cast aspersions," and that it caused a "damaging effect . . . on [Dr. Salzer's] reputation as a behaviorist." Defs.' Opp'n and Cross-Mot. at 17–18, ECF No. 223 (stating that Dr. Salzer's work at the MSPCA and Our Companions was "specifically excluded from the scope of her Agreement with BTD"; that the letter was not sent for "protective, compliance purpose[s]" but to "cast aspersions"; and that it had a "damaging effect . . . on [Dr. Salzer's] reputation as a behaviorist.").

On this record, whether the Plaintiffs' conduct was merely employment-related conduct outside CUTPA or instead conduct that could be deemed unfair under CUTPA cannot be resolved as a matter of law. *Ulbrich*, 310 Conn. at 409 (stating that CUTPA unfairness turns on whether the challenged conduct "offends public policy," is "immoral, unethical, oppressive, or unscrupulous," or "causes substantial injury to consumers, competitors or other businessmen").

The same is true of the Our Companions allegations. The Plaintiffs characterize that episode as "two-email exchanges" concerning "a public seminar." Pls.' Mem. in Supp. at 21–22, ECF No. 180-1. But the Defendants' CUTPA counterclaims allege that Plaintiffs attended the seminar, sought access to Dr. Salzer's presentation materials, and attempted to interfere with Dr. Salzer's teaching activities and her relationship with Our Companions. See Am. Answer, Affirmative Defenses, and Am. Countercls., ECF No. 86.

On this record, whether that conduct was merely incidental to an employment-related dispute or instead conduct occurring in "trade or commerce" cannot be resolved as a matter of law. *Muniz*, 59 Conn. App. at 711 (stating that "[t]o state a claim under CUTPA, the plaintiff must allege that the actions of the defendant were performed in the conduct of 'trade or

commerce' "); *Ulbrich*, 310 Conn. at 409 (stating that CUTPA unfairness turns on whether the challenged conduct "offends public policy," is "immoral, unethical, oppressive, or unscrupulous," or "causes substantial injury to consumers, competitors or other businessmen").

The Defendants specifically argue that "Ms. Winter was concerned by Mr. Savage's conduct, and understood his behavior immediately for what it was—an attempt to monitor Dr. Salzer's work and to interfere with the scheduled education programming she had planned for Dr. Salzer," that "Dr. Salzer lost her job at Our Companions because of Sean Savage," and that "[n]one of Plaintiffs' interference with Our Companions related to the 'proper investigation and enforcement of Defendants' Agreement' and only related to trying to stifle competition." Defs.' Opp'n and Cross-Mot. at 21–22, ECF No. 223.

The recommendation letter issue likewise suggests factual issues to be resolved at a trial. The Defendants allege that the Plaintiffs "repeatedly dangled the promise" of a recommendation letter necessary to Dr. Salzer's CAAB credential and then refused to provide it unless she agreed to relocate and work for them in Dallas, Texas. *See* Am. Answer, Affirmative Defenses, and Am. Countercls., ECF No. 86, at 2–3, 48–49. While the Plaintiffs argue that employment recommendation letters are not subject to CUTPA, the Defendants connect that alleged refusal to Dr. Salzer's ability to obtain certification and referrals in Connecticut.

On this record, the Court cannot conclude as a matter of law that this alleged conduct falls outside CUTPA. *Connelly*, 213 Conn. at 362 (stating that "[w]hether the defendant is subject to CUTPA is a question of law, not fact"); *Muniz*, 59 Conn. App. at 711 (stating that "an employment relationship does not constitute trade or commerce for purposes of CUTPA").

The McClutchy allegations and the alleged undercover inquiry also present triable issues. While the Plaintiffs characterize that episode as "a limited, nonpublic 'mystery-shopper'

inquiry." Pls.' Mem. in Supp. at 17, ECF No. 180-1, on this record, whether that conduct was justified pre-suit investigation or instead conduct that a reasonable factfinder could deem deceptive or unfair under CUTPA cannot be resolved as a matter of law. *Ulbrich*, 310 Conn. at 409 (stating that CUTPA unfairness turns on whether the challenged conduct "offends public policy," is "immoral, unethical, oppressive, or unscrupulous," or "causes substantial injury to consumers, competitors or other businessmen").[10]

The Defendants also argue that "The University of Kansas Take-Down Notice Was Improper," that the "purportedly misappropriated material was a document that was used 'solely for academic purposes' and thus 'exempt' from Dr. Salzer's non-disclosure agreement with BTD," and that "BTD made demonstrably false allegations to protect non-existent legal rights knowing that an academic misconduct investigation into Dr. Salzer's dissertation could be reputationally ruinous." Defs.' Opp'n and Cross-Mot. at 26, 30, ECF No. 223. Although the Plaintiffs' motion does not separately engage that theory, it is part of the challenged course of conduct already pleaded and reinforces the existence of disputed issues of fact as to unfairness and deception.

The same is true of ascertainable loss. The Plaintiffs rely heavily on the proposition that Dr. Salzer "cannot identify any client lost by BTD's conduct, including the mystery-shopper interaction." Pls.' L.R. 56(a)(1) Stmt. ¶ 37, ECF No. 181 (stating that Dr. Salzer "cannot identify a single client she lost as a result of BTD's actions"). The Defendants, however, need not "prove a specific amount of actual damages in order to make out a prima facie case," but they still "must

---

[10] The Defendants likewise argue that the "Plaintiffs offer no evidence that the McClutchy scheme or the defamatory statements were part of any pre-suit investigation," that "there are no communications either produced or logged that would substantiate that these activities were in any way associated with a pre-suit investigation as Plaintiffs now claim," that "[i]t was not" a "prudent pre-filing investigation," and that Mr. McClutchy "made false statements of material fact in his interactions with Dr. Salzer involving an elaborate series of falsehoods, misrepresentations, and deceptive conduct." Defs.' Opp'n and Cross-Mot. at 22–23, ECF No. 223.

marshal some evidence of ascertainable loss in support of [their] CUTPA allegations, and a failure to do so is indeed fatal to a CUTPA claim on summary judgment." *Marinos*, 308 Conn. at 714, 718; *see Nwachukwu*, 257 F. Supp. 3d at 290 (stating that "a plaintiff, in order to establish a viable CUTPA claim, must plead and prove both these elements: first, conduct by the defendant which violates the statute; and second, an ascertainable loss suffered by plaintiff caused by that conduct").

Here, even the Plaintiffs' expert "quantifies Defendants' lost profits as between $17,044 and $29,885." Defs.' Reply at 9, ECF No. 272 (stating that Plaintiffs' expert "quantifies Defendants' lost profits between $17,044 and $29,885"). And record evidence includes adjusted "Historical Lost Profit Calculations" of "$29,885" under "Scenario 1" and "$17,044" under "Scenario 2." Ex. 42, at 23, ECF No. 272-2/Ex. 42. Record evidence also lists "Our Companions Animal Rescue" and "MSPCA-Angel" in the lost-profit calculations. *Id.* at 24 (listing "Our Companions Animal Rescue" and "MSPCA-Angel" in the lost-profit calculations).

The record evidence also shows that "Dr. Salzer lost prospective customers because Plaintiffs killed Defendants' business development efforts," that "Dr. Salzer's lecture series was cancelled, she was put on leave and then ultimately fired from her job at Our Companions," and that "Dr. Salzer spent time and effort working and researching Mr. McClutchy's case who turned out to be a fake customer sent by Plaintiffs." Defs.' Opp'n and Cross-Mot. at 34, ECF No. 223. The persuasiveness of this proof is for another day. At the summary judgment stage, it is more than enough to create a genuine issue of fact as to the Defendants' ascertainable loss.

Accordingly, the Plaintiffs' motion for summary judgment as to the CUTPA claims will be denied.

### 3. The Tortious Interference Counterclaims

Under Connecticut law, to prevail on a claim for tortious interference with contractual relations, a plaintiff must prove "(1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Dichello Distribs., Inc. v. Anheuser-Busch, LLC*, 715 F. Supp. 3d 220, 269 (D. Conn. 2024).

For tortious interference with business expectancies, a plaintiff "must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." *Downes-Patterson Corp. v. First Nat'l Supermarkets, Inc.*, 64 Conn. App. 417, 429 (2001; *see Reyes v. Chetta*, 143 Conn. App. 758, 766 (2013) (stating that "[a] successful action for tortious interference with business expectancies requires the satisfaction of three elements: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss"). "Not every act that disturbs a contract or business expectancy is actionable." *Blake v. Levy*, 191 Conn. 257, 260 (1983) (stating that "[n]ot every act that disturbs a contract or business expectancy is actionable"); *American Diamond Exch., Inc. v. Alpert*, 101 Conn. App. 83, 90 (2007) (stating that "not every act that disturbs a business expectancy is actionable"). Rather, "[a] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Blake*, 191 Conn. at 261 (stating that "[a] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself"); *Reyes*, 143

48

Conn. App. at 766 (stating that "[a] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself").

The plaintiff also "must plead and prove at least some improper motive or improper means," and "the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." *Reyes*, 143 Conn. App. at 766-67; *American Diamond Exch.*, 101 Conn. App. at 91 (same. And tortious interference requires "malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805-06 (1999) (quoting *Blake v. Levy*, 191 Conn. 257, 260-61 (1983)).

Dr. Salzer and Canine Behavioral Blueprints allege tortious-interference counterclaims based on the Plaintiffs' alleged interference with Dr. Salzer's prospective and contractual relationships with MSPCA and Our Companions.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that the MSPCA letter "accurately summariz[ed] surviving confidentiality/non-use and document-return obligations," "expressly stat[ed] BTD was not accusing her of wrongdoing," and caused no adverse employment action. Pls.' Mem. in Supp. at 29, ECF No. 180-1. They also argue that the Our Companions contacts were "two routine emails" about "a public CEU seminar" and that "[n]either episode satisfies essential elements." *Id.* at 28, 30.

In response, Dr. Salzer and Canine Behavioral Blueprints argue that Beyond the Dog, Dr. Echterling-Savage, and Sean Savage "lied to third parties about their intellectual property and contract rights," and that those false assertions "unfairly interfered in Dr. Salzer's employment relationships or business." Defs.' Reply at 8, ECF No. 272. They also argue that the McClutchy investigation "was not an authorized mystery-shopper inquiry," and that the Plaintiffs "cannot have it both ways" by denying that they sent McClutchy on a mission while also claiming

privilege because the contact was part of a "coordinated investigation leading to litigation." *Id.* at 8-9.

Dr. Salzer and Canine Behavioral Blueprints further argue that "Dr. Salzer lost her job at Our Companions because of Sean Savage," that "[s]he also lost all the revenue she would have earned from the cancelled lecture series," that "[d]r. Salzer's lost her chance to grow her reputation through her work at Our Companions," and that "[n]one of Plaintiffs' interference with Our Companions related to the 'proper investigation and enforcement of Defendants' Agreement' and only related to trying to stifle competition." Defs.' Opp'n and Cross-Mot. at 22, ECF No. 223. They also argue that the "Plaintiffs offer no evidence that the McClutchy scheme or the defamatory statements were part of any pre-suit investigation," that "there are no communications either produced or logged that would substantiate that these activities were in any way associated with a pre-suit investigation as Plaintiffs now claim," and that "[i]t was not" a "prudent pre-filing investigation." *Id.* at 22-23.

The Court agrees.

Even if Beyond the Dog's evidence were credited, on this record, there are genuine issues of material fact requiring a trial. The MSPCA letter did more than neutrally preserve rights. It asked MSPCA to take "necessary steps" and to "implement[] measures." Ex. DD, ECF No. 181-4, at 3 (requesting "necessary steps" and "implementing measures"). The July 15, 2025 e-mail states that "Dr. Bright implemented measures at the MSPCA based on our application." Ex. L, ECF No. 181-12, at 2. And Dr. Salzer's and Canine Behavioral Blueprints' damages evidence includes lost-profit calculations tied to Canine Behavioral Blueprints, Our Companions, and MSPCA. Ex. 42, at 24, ECF No. 272-2/Ex. 42.

That record is sufficient to preclude summary judgment not only on loss and causation generally, but also on the MSPCA interference theory specifically pleaded here. *See* Am. Countercls. ¶¶ 394-411, ECF No. 86. The Defendants also point to ECF No. 223's contention that the Plaintiffs' MSPCA letter was not taken for "protective, compliance purpose[s]" but to "cast aspersions" and to create a "damaging effect . . . on [Dr. Salzer's] reputation as a behaviorist," and that Dr. Bright viewed the letter as "mysterious and threatening" and as requiring the MSPCA to "watch her, police her, babysit her, so that she doesn't hurt Beyond the Dog." Defs.' Opp'n and Cross-Mot. at 17–18, ECF No. 223.

The same is true of the Our Companions theory. The Plaintiffs characterize those contacts as "two routine emails" about "a public CEU seminar." Pls.' Mem. in Supp. at 28, 30, ECF No. 180-1 (stating that the Our Companions contacts were "two routine emails" about "a public CEU seminar" and that "[n]either episode satisfies essential elements"). But there is record evidence that the Plaintiffs interfered with Dr. Salzer's relationship with Our Companions and that this interference resulted in cancelled presentations and lost business opportunities. See Am. Countercls. ¶¶ 394-411, ECF No. 86. And the record includes evidence that separately lists "Our Companions Animal Rescue" in the lost-profit calculations. Ex. 42, at 24, ECF No. 272-2/Ex. 42 (listing "Our Companions Animal Rescue" in the lost-profit calculations).

On this record, the Court cannot conclude as a matter of law that the Our Companions theory fails for lack of relationship, intent, causation, or loss. *Downes-Patterson*, 64 Conn. App. at 429 (stating that a plaintiff must prove that "a business relationship existed," that the defendant "intentionally interfered with the business relationship while knowing of the relationship," and that "the plaintiff suffered actual loss").

51

The Defendants further argue that "Ms. Winter was concerned by Mr. Savage's conduct, and understood his behavior immediately for what it was—an attempt to monitor Dr. Salzer's work and to interfere with the scheduled education programming she had planned for Dr. Salzer," and that Sean Savage later admitted that "the purpose of watching the presentation was in the hope that she was not presenting our proprietary information to other people." Defs.' Opp'n and Cross-Mot. at 21-22, ECF No. 223.

Moreover, while Beyond the Dog, Dr. Echterling-Savage, and Sean Savage characterize the McClutchy contact as "a limited, nonpublic 'mystery-shopper' inquiry," Pls.' Mem. in Supp. at 17, ECF No. 180-1, this alleged interference can be viewed as something accomplished through misrepresentation, intimidation, or other improper and unjustifiable conduct, *see* Defs.' Opp'n and Cross-Mot. at 23, ECF No. 223 (stating that Mr. McClutchy "did not act as a mystery shopper who simply obtained information that was available to any member of the public" and that he "made false statements of material fact in his interactions with Dr. Salzer involving an elaborate series of falsehoods, misrepresentations, and deceptive conduct."), within the scope of these claims. *See Reyes*, 143 Conn. App. at 766-67 (stating that "the plaintiff must plead and prove at least some improper motive or improper means" and that "the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]"); *American Diamond Exch.*, 101 Conn. App. at 91 (stating that "the plaintiff must plead and prove at least some improper motive or improper means" and that "the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]").

On this record, whether Beyond the Dog's conduct was justified enforcement, or instead interference that was "wrongful by some measure beyond the fact of the interference itself" and "without justification," cannot be resolved as a matter of law. *See Graham v. Henderson*, 89 F.3d

75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

Accordingly, Plaintiffs' motion for summary judgment as to the tortious interference counterclaims will be denied.

### 4.  The Defamation *Per Se* Counterclaim

Under Connecticut law, to prevail on a claim for defamation, whether *per se* or otherwise, a plaintiff must prove a false statement of fact. *Gleason v. Smolinski*, 319 Conn. 394, 431 (2015) (stating that "for a claim of defamation to be actionable, the statement must be false");*Gerrish v. Hammick*, 198 Conn. App. 816, 825 (2020) (stating that "a defendant cannot be held liable for defamation if the statement at issue is substantially true"). In a civil libel action, "the truth of an allegedly libelous statement of fact provides an absolute defense," and "only substantial proof need be shown to constitute the justification." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 112-13 (1982).

When a statement charges theft, moreover, Connecticut law recognizes that such a statement may be actionable per se. *Miles v. Perry*, 11 Conn. App. 584, 601 (1987) (stating that "[s]tatements accusing a plaintiff of theft are libelous or slanderous per se" and that "[t]he words used, however, must be accorded their common and ordinary meaning, without enlargement by innuendo"); *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 842, 851-52 (2005) (stating that "[a]n accusation that someone is guilty of theft would fit the definition of a defamatory statement," that "[w]]hen the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation," and that "[i]n general, there are

two classes of libel that are actionable per se: '(1) libels charging crimes and (2) libels which injure a man in his profession and calling....' ").

Connecticut's litigation privilege also protects communications "uttered or published in the course of judicial proceedings" so long as they are "in some way pertinent to the subject of the controversy," and the privilege "extends not merely to those made directly to a tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding." *Hopkins v. O'Connor*, 282 Conn. 821, 830, 832-33 (2007); *Sicignano v. Pearce*, 228 Conn. App. 648, 666-67 (2021) (stating that "[t]he privilege extends beyond statements made during a judicial proceeding to preparatory communications that may be directed to the goal of the proceeding" and that ""[t]here is no requirement under Connecticut jurisprudence that to be considered part of a judicial proceeding, statements must be made in a courtroom or under oath or be contained in a pleading or other documents submitted to the court" and that "[i]ndeed, [t]he privilege extends beyond statements made during a judicial proceeding to preparatory communications that may be directed to the goal of the proceeding.... In addition ... the absolute privilege that is granted to statements made in furtherance of a judicial proceeding extends to every step of the proceeding until final disposition"); *Ravalese v. Lertora*, 186 Conn. App. 722, 729, 733 (2018) (stating that "if, however, the communications are uttered or published in the course of judicial proceedings, even if they are published falsely and maliciously, they nevertheless are absolutely privileged provided they are pertinent to the subject of the controversy" and that "[i]t is well established that a statement made as a preliminary step in litigation does not disqualify it from being absolutely privileged").

Dr. Salzer asserts a defamation *per se* counterclaim based on the allegation that Sean Savage told Daniel McClutchy that Dr. Salzer "stole" Beyond the Dog's intake form, that the

54

statement "communicated to Mr. McClutchy that Dr. Salzer committed theft of trade secrets and is dishonest in business," and that "these or similar statements have been made to other, unknown third parties." *See* Am. Countercls. ¶¶ 414-417, ECF No. 86.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that this counterclaim fails because "the only evidence is that no such unambiguous criminal accusation was made," that any suggestion Dr. Salzer "had taken/retained BTD materials is at least substantially true," and that the challenged communications were "classic pre-suit investigative acts." Pls.' Mem. in Supp. at 31-33, ECF No. 180-1. They also rely on the July 2025 production and argue that Dr. Salzer produced materials "covered by §§ 1(E) and 1(F) well after her employment ended." *Id.* at 32-33 (stating that Dr. Salzer produced materials "covered by §§ 1(E) and 1(F) well after her employment ended").

In response, Dr. Salzer argues that Beyond the Dog's privilege theory and factual account do not align. She argues that the McClutchy investigation "was not an authorized mystery-shopper inquiry," that Beyond the Dog and the Savages "lied to her so he could steal her business information and funnel it back to the Plaintiffs," and that Plaintiffs "cannot have it both ways" by simultaneously disavowing and claiming privilege for the contact. Defs.' Reply at 8-9, ECF No. 272.

Dr. Salzer and Canine Behavioral Blueprints further argue that "Mr. Savage made a defamatory statement to Mr. Daniel McClutchy stating that Dr. Salzer had stolen BTD's intake form"; that "Mr. Savage's defamatory statement calling Dr. Salzer a thief was false"; that "[t]he statement was not innocent innuendo but clear declarative statement of fact that Dr. Salzer was a thief"; and that "[t]his defamatory statement was part of a deliberate plan to embroil McClutchy

in the Savages' anti-competitive campaign." Defs.' Opp'n and Cross-Mot. at 36–37, ECF No. 223.

The Court agrees.

While Beyond the Dog, Dr. Echterling-Savage, and Sean Savage may ultimately prevail on truth, substantial truth, or privilege, on this record, summary judgment cannot be granted. Under Connecticut law, "for a claim of defamation to be actionable, the statement must be false." *Gleason*, 319 Conn. at 431. A defendant also "cannot be held liable for defamation if the statement at issue is substantially true." *Gerrish*, 198 Conn. App. at 825. And in a civil libel action, "the truth of an allegedly libelous statement of fact provides an absolute defense," with "only substantial proof need be shown to constitute the justification." *Goodrich*, 188 Conn. at 112-13.

At the same time, Connecticut recognizes that "[s]tatements accusing a plaintiff of theft are libelous or slanderous per se," although "[t]he words used, however, must be accorded their common and ordinary meaning, without enlargement by innuendo." *Miles*, 11 Conn. App. at 601. Likewise, "[a]n accusation that someone is guilty of theft would fit the definition of a defamatory statement," and, "[w]hen the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation." *Gambardella*, 86 Conn. App. at 851-52.

For example, the unresolved contract issue, limited as to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement, bears directly on falsity and substantial truth here. They also bear directly on this counterclaim that Sean Savage's

56

statement to McClutchy communicated that Dr. Salzer "committed theft of trade secrets and is dishonest in business." *See* Am. Countercls. ¶ 415, ECF No. 86.

The Defendants also argue that "the questionnaire is publicly available, contains no trade secrets, and so it cannot be stolen"; that "Sean Savage was unable to discern which BTD 'trade secrets' were in Dr. Salzer's form"; and that "Dr. Savage did not compare BTD's Questionnaire to Dr. Salzer's Questionnaire until after the suit was filed, so there is no way the Savages could have known whether Dr. Salzer copied BTD's Questionnaire when Sean Savage made defamatory statements about Dr. Salzer to Mr. McClutchy." Defs.' Opp'n and Cross-Mot. at 36–37, ECF No. 223. On this record, the Court thus cannot conclude as a matter of law either that no accusation of theft was made or that any such accusation was substantially true.

The privilege issue also remains disputed. Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that the McClutchy contact was part of a "coordinated investigation leading to litigation." Pls.' Mem. in Supp. at 33, ECF No. 180-1. Dr. Salzer, by contrast, argues that Dr. Savage said, "I did not send Dan out on this mission," and that Plaintiffs "cannot have it both ways." Defs.' Reply at 9, ECF No. 272.

Connecticut law recognizes that "communications uttered or published in the course of judicial proceedings are absolutely privileged [as] long as they are in some way pertinent to the subject of the controversy," and that "the scope of privileged communication extends not merely to those made directly to a tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding." *Gallo v. Barile*, 284 Conn. 459, 466, 472 (2007).

But the Connecticut Supreme Court in *Gallo* also explained that "the defendants' allegedly false and malicious statements to the police are qualifiedly, rather than absolutely, privileged." *Gallo*, 284 Conn. at 477. The Defendants also argue that the "Plaintiffs offer no

evidence that the McClutchy scheme or the defamatory statements were part of any pre-suit investigation"; that "there are no communications either produced or logged that would substantiate that these activities were in any way associated with a pre-suit investigation as Plaintiffs now claim"; and that "[t]he McClutchy scheme is not protected by any litigation privilege." Defs.' Opp'n and Cross-Mot. at 22–23, 26, 37–38, ECF No. 223. On this record, whether the challenged communications were privileged preparatory communications directed to the goal of litigation, or instead fall outside the privilege, cannot be resolved as a matter of law.

The Court also need not determine at this stage whether Dr. Salzer can prove publication beyond McClutchy. Because this defamation *per se* counterclaim alleges that "these or similar statements have been made to other, unknown third parties," there is sufficient record evidence to preclude judgment as a matter of law. *See* Am. Countercls. ¶ 416, ECF No. 86.

Accordingly, Plaintiffs' motion for summary judgment as to the defamation *per se* counterclaim will be denied.

### 5. The Common-Law Unfair Competition Counterclaim

Connecticut's common-law unfair competition doctrine is "a generic name for a number of related torts involving improper interference with business prospects." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 502 n.24 (1995) (quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 130, p. 1013). Connecticut law recognizes under that umbrella such causes of action as tortious interference with business expectancy and "unjustifiable interference with any [person's] right to pursue his [or her] lawful business or occupation." *Id.* at 502 n.24.

As the Connecticut Supreme Court has explained, "[f]ull, fair, and free competition is necessary to the economic life of a community, but under its guise, no man can, by unlawful means, prevent another from obtaining the fruits of his labor." *Skene v. Carayanis*, 103 Conn.

708, 714 (1926). Thus, "[n]o man can justify an interference with another man's business through fraud or misrepresentation, nor by intimidation, obstruction, or molestation." *Id.* (stating that "[n]o man can justify an interference with another man's business through fraud or misrepresentation, nor by intimidation, obstruction, or molestation.").

Consistent with that principle, in this context the plaintiff must prove that the defendant "was guilty of fraud, misrepresentation, intimidation or molestation, or that the defendant acted maliciously, in interfering with the plaintiff's business prospects." *Larsen*, 232 Conn. at 503 n.24; *Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747, 754 (1984) (stating that "[a] cause of action for tortious interference with a business expectancy requires proof 'that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously.'"). The common-law action of unfair competition also is "a general tort covering many activities that may be harmful to commercial interests." *Prime Publishers, Inc. v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 284 (D. Conn. 2001).

But it remains distinct from CUTPA. "[T]he essential difference between a tort claim for interference with business expectancies and a claim under CUTPA is the standard by which the alleged acts are measured" and that "[c]onduct that might be actionable under CUTPA may not rise to a level sufficient to invoke tort liability." *Sportsmen's Boating*, 192 Conn. at 754.

Although the Court analyzed Beyond the Dog's unfair-competition claim under Missouri law, Dr. Salzer's and Canine Behavioral Blueprints' counterclaim for common-law unfair competition, will be analyzed under Connecticut law. Under this counterclaim, Dr. Salzer and Canine Behavioral Blueprints allege that "[s]ince leaving Plaintiffs' employment, Defendants have made three attempts at pursuing lawful business and occupation," namely "(1) Dr. Salzer commenced work at MSPCA in Massachusetts; (2) Dr. Salzer commenced work at Our

Companions Animal Rescue in Connecticut; and (3) Defendants began a private clinic," and that

"[p]laintiffs have unlawfully interfered with each and restricted her ability to effectively grow

Dr. Salzer's reputation and pursue business as a Certified Applied Animal Behaviorist in relation

to all three pursuits." *See* Am. Countercls. ¶¶ 424-425, ECF No. 86.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that "[t]here is no fraud,

misrepresentation, intimidation, or malicious interference and no resulting loss," that their

conduct was "justified, minimal and lawful," and that Dr. Salzer and Canine Behavioral

Blueprints "cannot prove the wrongful-means element or cognizable injury." Pls.' Mem. in Supp.

at 35-36, ECF No. 180-1. They emphasize that the "mystery-shopper investigation produced no

lost client," that the Our Companions matter resulted in "no lost business or professional fallout,"

and that MSPCA "was unaffected." *Id.* at 35.

In response, Dr. Salzer and Canine Behavioral Blueprints argue that the same conduct

underlying their CUTPA and tortious-interference counterclaims also supports Count VII. They

argue that Beyond the Dog, Dr. Echterling-Savage, and Sean Savage "lied to third parties about

their intellectual property and contract rights," and that this "foundational unfairness" defeats the

motion. Defs.' Reply at 8, ECF No. 272. They also rely on allegations that Plaintiffs withheld the

promised CAAB recommendation letter, interfered with Dr. Salzer's work at MSPCA and Our

Companions, and orchestrated the undercover inquiry in an effort to damage the Defendants'

clinic and Dr. Salzer's professional reputation. *See* Am. Countercls. ¶¶ 424-430, ECF No. 86.

Dr. Salzer and Canine Behavioral Blueprints argue that the Plaintiffs' conduct was part of

"a years-long harassment campaign against a local Connecticut small business owner trying to

make productive use of over a decade of education and training in animal behavior," that "[t]he

Savages waged an anticompetitive campaign designed to ruin her reputation, kill her business,

60

and drive her from a field in which she worked hard to develop unique expertise," and that "[t]heir tactics were relentless." Defs.' Opp'n and Cross-Mot. at 1, ECF No. 223.

They also argue that the "[p]laintiffs' outreach to the MSPCA and Our Companions was improper and illegitimate," that the "Plaintiffs' conduct regarding the MSPCA and Our Companions cannot be dismissed as employment issues because Dr. Salzer's employment agreement with Beyond the Dog specifically exempted her work for non-profit organizations," and that "Dr. Salzer lost her job at Our Companions because of Sean Savage." *Id.* at 16, 18, 22. And as to the Defendants' private clinic and credentials, they argue that "Without the letter of recommendation from Plaintiffs, Dr. Salzer's certification as a CAAB was severely and unnecessarily delayed," that "[o]nly CAABs, and not certified dog trainers, are capable of accepting insurance," and that "[l]osing that credential would impact Dr. Salzer's career and the future of CBB stifling competition in Connecticut." *Id.* at 32.

The Court agrees.

For substantially the same reasons set forth as to the Defendants' CUTPA and tortious interference claims, Beyond the Dog, Dr. Echterling-Savage, and Sean Savage are not entitled to summary judgment on this common-law unfair competition counterclaim. The record contains evidence from which a reasonable jury could find justified, limited enforcement conduct. The record also contains evidence from which a reasonable jury could find "fraud, misrepresentation, intimidation or molestation, or that the defendant acted maliciously, in interfering with the plaintiff's business prospects." *Larsen*, 232 Conn. at 503 n.24; *Sportsmen's Boating*, 192 Conn. at 754 (stating that "[a] cause of action for tortious interference with a business expectancy requires proof 'that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously.'").

61

The MSPCA letter asked MSPCA to take affirmative "measures." Ex. DD, ECF No. 181-4, at 3. By sending that letter, the Plaintiffs arguably intended to "intimidate and threaten both Dr. Salzer and her new employer into curtailing her employment and professional business opportunities," and that the letter rested on "a misrepresentation about the scope of Plaintiffs' non-compete geographical restriction and that Plaintiffs maintain full confidentiality over their processes and procedures, which it does not." See Am. Countercls. ¶ 426, ECF No. 86. The Defendants also point to Dr. Bright's testimony that the MSPCA letter was "mysterious and threatening," that it "cast aspersions" on Dr. Salzer's reputation, and that it required the MSPCA to "watch her, police her, babysit her, so that she doesn't hurt Beyond the Dog." Defs.' Opp'n and Cross-Mot. at 17–18, ECF No. 223.

On this record, the Court cannot conclude as a matter of law that this conduct was merely "full, fair, and free competition" rather than interference accomplished "by unlawful means." *Skene*, 103 Conn. at 714.

The Our Companions allegations likewise remain part of this counterclaim. Dr. Salzer and Canine Behavioral Blueprints allege that, by attending the September 10, 2024 seminar and then requesting access to the presentation materials, the Plaintiffs intended to "intimidate Dr. Salzer and her new employer into ceasing all teaching activities," and that this conduct had a "chilling effect" on the Defendants' business and caused economic loss. *See id.* ¶ 427.

For the reasons already discussed as to the tortious interference claim, on this record, the Court cannot conclude as a matter of law that this theory fails. The Defendants further argue that Sean Savage's conduct at the seminar gave Peyton Winter the impression that he was "trying to monitor Dr. Salzer's work," and that Ms. Winter "discontinued Dr. Salzer's lecture series because of him." Defs.' Opp'n and Cross-Mot. at 18, ECF No. 223.

This counterclaim also reaches conduct directed at the Defendants' private clinic. There is record evidence that the Plaintiffs "refused to give Dr. Salzer a reference for her application to become a Certified Applied Animal Behaviorist as previously agreed," and that Plaintiffs thereby interfered with the Defendants' "ability to attract clientele covered by insurance policies for a period of time." See *id.* ¶ 428. And under this counterclaim, there is record evidence that the Plaintiffs "tried to trick Dr. Salzer into an unethical client engagement" so that the Plaintiffs could report her to the ethics board and have her "stripped of her CAAB certification." *See id.* ¶ 429.

Those allegations go beyond the MSPCA letter and the McClutchy contact. They speak directly to Dr. Salzer's ability to pursue her lawful occupation and to build Defendants' clinic in Connecticut. Connecticut law forbids "unjustifiable interference with any man's right to pursue his lawful business or occupation, and to secure to himself the earnings of his industry." *Skene*, 103 Conn. at 714.

The Defendants also argue that the CAAB delay mattered because "Only CAABs, and not certified dog trainers, are capable of accepting insurance," and because the loss of that credential would "impact Dr. Salzer's career and the future of CBB." Defs.' Opp'n and Cross-Mot. at 32, ECF No. 223. On this record, the Court cannot conclude as a matter of law that those theories fail for lack of wrongful means or lack of injury.

The McClutchy episode also remains disputed as to who orchestrated it and whether it reflected justified pre-suit inquiry or wrongful interference. Defs.' Reply at 8-9, ECF No. 272 (stating that Beyond the Dog, Dr. Echterling-Savage, and Sean Savage "cannot have it both ways"). That conduct overlaps with this conterclaimI's allegation that Plaintiffs engaged in an "unlawful campaign" that caused the Defendants "significant lost income and business since

63

establishing a presence in Connecticut." See *Id.* ¶ 430. The Defendants also contend that the McClutchy operation "went well beyond a mere concealment of identity," that Mr. McClutchy "made false statements of material fact in his interactions with Dr. Salzer involving an elaborate series of falsehoods, misrepresentations, and deceptive conduct," and that the scheme had a "detrimental impact on her business and her career." Defs.' Opp'n and Cross-Mot. at 22–25, 31, ECF No. 223. Loss also remains disputed in light of Dr. Salzer's and Canine Behavioral Blueprints' position that the Plaintiffs' own damages expert "quantifies Defendants' lost profits between $17,044 and $29,885," and that this "establishes sufficient loss under the Connecticut Unfair Trade Practices Act." Defs.' Reply at 9, ECF No. 272.

On this record, this counterclaim presents the same core factual disputes over falsity, justification, and injury that preclude summary judgment on the related Connecticut counterclaims. And while conduct actionable under CUTPA does not always "rise to a level sufficient to invoke tort liability," *Sportsmen's Boating*, 192 Conn. at 754, the present record contains enough evidence of alleged "misrepresentation," intimidation, and interference with Defendants' professional and business opportunities to require trial.

Accordingly, Beyond the Dog's, Dr. Echterling-Savage's, and Sean Savage's motion for summary judgment as to the Connecticut common-law unfair competition counterclaim will be denied.

### 6. The Negligent Infliction of Emotional Distress Counterclaim

Under Connecticut law, a claim for negligent infliction of emotional distress requires proof that the defendant "should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Montinieri v. S. New England Tel. Co.*, 175 Conn. 337, 345 (1978). In the

64

employment context, such a claim "arises only where it is based upon unreasonable conduct of the defendant in the termination process." *Parsons v. United Techs. Corp.*, 243 Conn. 66, 88 (1997) (quoting *Morris v. Hartford Courant Co.*, 200 Conn. 676, 682 (1986)). "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Parsons*, 243 Conn. at 88-89.

The Connecticut Supreme Court also has made clear that no such claim lies for conduct "arising out of actions or omissions occurring within the context of a continuing employment relationship, as distinguished from actions or omissions occurring in the context of termination of employment." *Perodeau v. City of Hartford*, 259 Conn. 729, 745, 763 (2002). And where the claimed distress arises from the use of legal process, Connecticut courts ask whether the defendant should have anticipated emotional distress "beyond that normally associated with litigation." *Wilson v. Jefferson*, 98 Conn. App. 147, 163 (2006).

Dr. Salzer and Canine Behavioral Blueprints allege not only business-related interference, but also a broader course of conduct that included attempts to "ruin Dr. Salzer's social relationships," surveillance of Dr. Salzer's home, deceptive inquiries directed at her business, interference with her work at MSPCA and Our Companions, the withholding of the promised CAAB recommendation, and an "unethical trick" designed to jeopardize her credentials. See Am. Countercls. ¶¶ 431-443, ECF No. 86.

Beyond the Dog, Dr. Echterling-Savage, and Sean Savage argue that this counterclaim fails because the challenged conduct involved "post-employment compliance" and "litigation-related activity," not the termination process, Pls.' Mem. in Supp. at 36-38, ECF No. 180-1, and because "the only evidence produced shows that Dr. Salzer's claims of PTSD stems from her marital dissolution, not from Plaintiffs' pre-suit conduct." *Id*. at 4. The record evidence likewise

cites testimony that Dr. Salzer's symptoms "developed in the context of a marital dissolution." Pls.' L.R. 56(a)(1) Stmt. ¶ 61, ECF No. 181.

In response, Dr. Salzer and Canine Behavioral Blueprints argue that Plaintiffs' argument "boils down to their hired gun disputing the opinions of Dr. Salzer's treating medical professionals," and that "[o]n this disputed record, summary judgment is not appropriate." Defs.' Reply at 9, ECF No. 272. They also argue that "Given that this is not an employment dispute, Plaintiffs additional elements are not applicable," that "Dr. Salzer's therapist disagrees," that "Plaintiffs pursued the University of Kansas complaint after being on notice that Dr. Salzer was already suffering from PTSD caused by their conduct," and that "[a]t least two witnesses have testified that Plaintiffs' conclusion that marital dissolution is the cause of Dr. Salzer's PTSD diagnosis is not correct." Defs.' Opp'n and Cross-Mot. at 40, ECF No. 223.

The Court agrees.

Connecticut law limits such claims in the employment context to unreasonable conduct in the termination process, not conduct arising within a continuing employment relationship. *Parsons*, 243 Conn. at 88-89 (stating that such a claim "arises only where it is based upon unreasonable conduct of the defendant in the termination process" and that "[t]he mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim"); *Perodeau*, 259 Conn. at 745, 763 (stating that no such claim lies for conduct "arising out of actions or omissions occurring within the context of a continuing employment relationship, as distinguished from actions or omissions occurring in the context of termination of employment"). Connecticut courts also ask, where the claimed distress arises from legal process, whether the defendant should have anticipated emotional distress "beyond that normally associated with litigation." *Wilson*, 98 Conn. App. at 163.

But this counterclaim extends beyond an ordinary employment-termination dispute or distress arising solely from litigation. The Defendants argue that, "[i]n addition to the misrepresentations and interference to Defendants' business relationships described in the preceding paragraphs, the Plaintiffs have tried to ruin Dr. Salzer's social relationships as well." Am. Countercls. ¶ 432, ECF No. 86. They further argue that the Plaintiffs "incorrectly attributed" a Venmo reimbursement from a friend "as improper business revenue," that the Plaintiffs' "deep probe into Dr. Salzer's social relationships has caused Dr. Salzer to retreat from her social circle," and that this "has led to Dr. Salzer's increasing withdrawal and isolation from her friendships." Am. Countercls. ¶¶ 435-436, ECF No. 86.

On this record, however, the Court need not finally decide whether all of the challenged conduct falls outside the termination process, because the motion fails in any event given the number of factual disputes, including issues over medical causation and emotional-distress proof. While Beyond the Dog, Dr. Echterling-Savage, and Sean Savage rely on testimony that Dr. Salzer's symptoms "developed in the context of a marital dissolution," Pls.' L.R. 56(a)(1) Stmt. ¶ 61, ECF No. 181, as Dr. Salzer and Canine Behavioral Blueprints note, that is a "battle of the experts" involving "Dr. Salzer's treating medical professionals." Defs.' Reply at 9, ECF No. 272.[11]

As a result, construing the facts in the Defendants' favor, and given the record evidence of surveillance, deceptive inquiry, interference with social and professional relationships, and a PTSD diagnosis allegedly "resulting from Plaintiffs' conduct," these issues are not something to be resolved at the summary judgment stage. *See Dufort v. City of New York*, 874 F.3d 338, 343,

---

[11] They also point to ECF No. 223's contention that the "Plaintiffs pursued the University of Kansas complaint after being on notice that Dr. Salzer was already suffering from PTSD caused by their conduct" and that "[a]t least two witnesses have testified that Plaintiffs' conclusion that marital dissolution is the cause of Dr. Salzer's PTSD diagnosis is not correct." Defs.' Opp'n and Cross-Mot. at 40, ECF No. 223.

347 (2d Cir. 2017) (stating that, "[o]n a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought'").

Accordingly, Plaintiffs' motion for summary judgment as to the negligent infliction of emotional distress counterclaim will be denied.

## IV. CONCLUSION

For the foregoing reasons, Dr. Salzer's and Canine Behavioral Blueprints' motion for summary judgment, ECF No. 151, is **GRANTED** in part and **DENIED** in part.

Beyond the Dog's federal and Missouri misappropriation of trade secret claims, the unjust enrichment claim, and the federal and Missouri unfair competition claims are **DISMISSED**.

Beyond the Dog's breach of contract claim will proceed to trial, but all post-employment obligations under any of the terms of the Trainer Non-Compete Agreement ended on March 23, 2025, and this claim is limited to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement.

Beyond the Dog's, Dr. Echterling-Savage's, and Sean Savage's motion for summary judgment, ECF No. 180, is **DENIED**.

Dr. Salzer's and Canine Behavioral Blueprints' counterclaims also will proceed to trial.

As to the declaratory judgment counterclaim, consistent with the scope of Beyond the Dog's breach of contract claim, Sections 1(E) and 1(F) of the Trainer Non-Compete Agreement

are subject to the two-year limitation applicable to Sections 1(A), 1(B), and 1(C), and all post-employment obligations under the Trainer Non-Compete Agreement ended on March 23, 2025.

But there is a genuine issue of fact as to the Trainer Non-Compete Agreement, limited to only whether Dr. Salzer improperly retained the "Confidential Information" expressly described in this Ruling and Order before March 23, 2025, in violation of the Trainer Non-Compete Agreement.

**SO ORDERED** at New Haven, Connecticut, this 31st day of March, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE